# EXHIBIT 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

```
                        )
SUSAN E. MORELAND, on behalf )
of herself and all others    )
similarly situated,        )
                        ) Case No.
        Plaintiff,      ) SACV 13-00470 AG (ANx)
                        )
vs.               )
                        )
CORELOGIC SAFERENT, LLC,,   )
                        )
        Defendant.        )
_____)
```

**\*\*CONFIDENTIAL\*\***

VIDEOTAPED DEPOSITION OF SUSAN ELIZABETH MORELAND

Phoenix, Arizona

December 17, 2013

Prepared by:

Meri Coash, RMR, CRR

Certified Realtime Reporter

(Copy)          Certified Reporter #50327

Susan Elizabeth Moreland                    December 17, 2013

## Page 2

1
2        I N D E X
         WITNESS                                    PAGE
3        SUSAN ELIZABETH MORELAND
4
             Examination by Mr. Raether        7
5
             Examination by Mr. Marchiando    176
6
             Further Examination by Mr. Raether   177
7
8
9        EXHIBITS MARKED
10       EXHIBITS      DESCRIPTION        FIRST
                                          REFERENCE
11
12       Exhibit 1   Rental Application      58
             MORELAND 000022-28
13       Exhibit 2   Rental Application      60
             RAMOS 000001-26
14           CONFIDENTIAL
15       Exhibit 3   Residential Rental Agreement   76
             MORELAND 000012-21
16
         Exhibit 4   Email chain ending with email from   80
17           Ronald Raether to Donald Burton
             dated 12-3-13
18           RAMOS000049-51
19       Exhibit 7   Credco Instant Merge Credit Report   85
             for Susan Burano dated 4-4-12
20
         Exhibit 8   Credco Instant Merge Credit Report   85
21           for Susan Burbano dated 4-4-12
             MORELAND 000029-37
22
23       Exhibit 10  Lease Decision dated 4-4-12     87
24       Exhibit 11  Voluntary Petition     38
25       Exhibit 12  Lease Decision dated 4-4-12     99
             MORELAND 000001-9

## Page 3

1        Exhibit 13  Federal Trade Commission complaint   142
             confirmation
2            MORELAND 000011
3        Exhibit 14  Letter from Susan Moreland to   152
             CoreLogic SafeRent dated 10-19-12
4
         Exhibit 15  Letter from CoreLogic SafeRent to   157
5            Susan Moreland dated 1-16-13
6        Exhibit 16  Complaint Class Action Susan E.   159
             Moreland vs. CoreLogic, Inc.
7            Case No. SACV13-00470 AG (ANx)
8        Exhibit 17  First Amended Complaint Class   160
             Action Susan E. Moreland vs.
9            CoreLogic, Inc.
             Case No. SACV13-00470 AG (ANx)
10
         Exhibit 18  Second Amended Complaint Class   160
11           Action Susan E. Moreland vs.
             CoreLogic, Inc.
12           Case No. SACV13-00470 AG (ANx)
13       Exhibit 19  Plaintiff's Rule 26(a) Initial   168
             Disclosures Susan E. Moreland vs.
14           CoreLogic, Inc.
             Case No. SACV13-00470 AG (ANx)
15
         Exhibit 20  Shockness Property Group   172
16           Residential Lease Application
17       Exhibit 21  Shockness Property Group signature   174
             page
18
19
20               REQUESTS
21           Page 119   Line 6
22
23
24
25

## Page 4

1        INSTRUCTIONS NOT TO ANSWER
2            Page  48    Line 19
3            Page 154    Line 15
4            Page 155    Line 2
5            Page 178    Line 7
6            Page 180    Line 20
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1        VIDEOTAPED DEPOSITION OF SUSAN ELIZABETH MORELAND
2        was taken on December 17, 2013, commencing at 8:55 a.m.,
3        at the offices of Arizona Reporting Service, 2200 North
4        Central Avenue, Suite 502, Phoenix, Arizona, before Meri
5        Coash, a Certified Reporter in the State of Arizona.
6
7
8                    * * *
9
10       APPEARANCES:
         For the Plaintiff:
         CADDELL & CHAPMAN
11       By:  Craig C. Marchiando, Esq.
             1331 Lamar
12           Suite 1070
             Houston, Texas  77010
13           713-751-0400
             ccm@caddellchapman.com
14
         For the Defendant:
15       FARUKI IRELAND & COX, PLL
         By:  Ronald I. Raether, Jr., Esq.
16           500 Courthouse Plaza, S.W.
             10 North Ludlow Street
17           Dayton, Ohio  45402
             937-227-3733
18           rraether@ficlaw.com
19       Also present:  Jon Baugues, videographer
20
21
22
23
24
25

Coash and Coash, Inc.                    602-258-1440

Susan Elizabeth Moreland                    December 17, 2013

---

## Page 6

1    TRANSCRIPT OF PROCEEDINGS
2    THE VIDEOGRAPHER:  We are on the record.
3    The time on the video monitor is 8:55 a.m.  Here begins
4    volume 1, video number 1 in the deposition of Susan
5    Moreland, in the matter of Moreland versus CaseLogic [sic]
6    SafeRent, LLC, in the United States District Court, for
7    the Central District of California, case number
8    SACV 13-00470.
9    Today's date is December 17th, 2013.  Our
10   court reporter is Meri Coash.  My name is Jon Baugues,
11   certified videographer, representing Coash & Coash.  This
12   video deposition is taking place at 2200 North Central
13   Avenue, Phoenix, Arizona 85004.
14   Counsel, please identify yourselves and
15   state whom you represent.
16   MR. MARCHIANDO:  Craig Marchiando with
17   Goodell and Chapman representing the plaintiff.
18   MR. RAETHER:  Ronald Raether with Faruki
19   Ireland & Cox for Defendant CoreLogic SafeRent, LLC.
20   THE VIDEOGRAPHER:  Would the court reporter
21   please swear in the witness.
22
23
24
25   (Next page, please.)

---

## Page 7

1    SUSAN ELIZABETH MORELAND,
2    the witness herein, having been first duly sworn by the
3    Certified Reporter, was examined and testified as follows:
4
5    EXAMINATION
6    BY MR. RAETHER:
7    Q.  Good morning, Ms. Moreland.
8    A.  Good morning.
9    Q.  My name is Ron Raether and I am one of the
10   attorneys for CoreLogic SafeRent, the defendant in the
11   action that you have brought.
12   Could you state your full name, please?
13   A.  Susan Elizabeth Moreland.
14   Q.  And we have some documents and testimony where
15   you went by Susan Burbano?
16   A.  That's right.
17   Q.  When did you change your name to Susan Moreland?
18   A.  Let's see.  2011.
19   Q.  Why did you change your name?
20   A.  I wanted to go back to my maiden name.
21   Q.  So you were married before?
22   A.  Yes.
23   Q.  When were you married?
24   A.  I've been married twice.  My first marriage to
25   Harry Mortenson, that was I believe 1984, approximately.

---

## Page 8

1    And then I married Carlos Burbano, I believe that was
2    1990 -- 1994 -- '5 -- '5 or '6, approximately.  I don't
3    remember exactly.
4    Q.  When did you divorce Carlos Burbano?
5    A.  Two thou-- My divorce was final in 2006.
6    Q.  Did you divorce Mr. Mortenson?  I assume you did.
7    A.  Yes.
8    Q.  When was that?
9    A.  That was -- let's see, four -- it was four years
10   later, so 1986, '7.  It was around that.  I don't remember
11   exactly.
12   Q.  What's your current address?
13   A.  It's 17732 North Lupine Trail, Surprise, Arizona
14   85374.
15   Q.  And how long have you lived on Lupine trails?
16   A.  We've been there now about six months -- six,
17   seven months.  That was from -- I don't remember exact
18   date that we moved in.
19   Q.  And are you renting the Lupine trails property?
20   A.  Yes.
21   Q.  Is that a house?
22   A.  It is a house.
23   Q.  And before Lupine trails, where did you live?
24   A.  We lived in Vista, California.  I don't remember
25   the address exactly.

---

## Page 9

1    Q.  Did you ever live in Utah?
2    A.  Yes, we did, for five months.
3    Q.  When did you live in Utah?
4    A.  2012.  Let me see -- 2000 -- yeah, 2000 -- what
5    are we in?  2000 -- I'm sorry, 2013.  Getting confused.
6    Q.  So currently you live in Lupine trails.  Before
7    that, you lived in Vista, California?
8    A.  Before Utah.  So -- I'm sorry, I know I'm getting
9    mixed up.
10   Arizona, our present address.  Then it was
11   Utah.  And before that was Vista.
12   Q.  And you can't recall the exact address in Vista?
13   A.  Let me think.  Terrace -- No, I'll need a minute
14   for that.  I don't remember.
15   Q.  That's okay.
16   How long -- how long did you live in Vista?
17   A.  We were there -- Let's see, we moved in in March
18   of 2- -- was it '12?  Or 13?  Let's see --
19   (An off-the-record discussion ensued.)
20   THE WITNESS:  Okay.  All right.  2012 we
21   moved in.  And I believe that was March of 2- -- April --
22   April of 2012.
23   BY MR. RAETHER:
24   Q.  How long did you live at the Vista, California
25   address?

---

Coash and Coash, Inc.                    602-258-1440

Susan Elizabeth Moreland                    December 17, 2013

## Page 30

1  today, just as you would be if you were in court?
2      A.  Yes.
3      Q.  So you're here to tell the truth?
4      A.  Yes.
5      Q.  I'll be asking questions.  I'll do my best to
6  make them clear and concise.  If you happen to not
7  understand my question, please feel free to ask me to
8  repeat the question.  It's important that you and I
9  understand each other during this process.  And if I ask a
10  question and you don't understand it, let me know.  Okay?
11      A.  Okay.
12      Q.  I'll try to rephrase it the best I can.
13      A.  Okay.
14      Q.  Likewise, it's -- I don't want you to speculate
15  or guess as to an answer.  So if you don't know the
16  answer, it's okay to say, "I don't know."  This is about
17  getting your testimony.  So you don't -- don't speculate,
18  don't guess.
19          Likewise, if you need a break --
20      A.  Uh-huh.
21      Q.  -- let me know.  We'll take a break whenever you
22  would like, as long as there's not a question pending.
23  I'm happy to stop and let you take a break.  This can be a
24  long process.  And if you need to take time out for a
25  break, I'll be happy to allow that.  Okay?

## Page 31

1      A.  Uh-huh.  Thank you.
2      Q.  So the North Lupine trails property, you
3  testified earlier that you rented that property?
4      A.  Yes.
5      Q.  It's the current one -- one you currently live
6  in?
7      A.  Yes.
8      Q.  Were you on the application for that?
9      A.  Yes.
10      Q.  Do you know if a credit or background check was
11  done on you?
12      A.  Yes.
13      Q.  Do you know which company was used?
14      A.  No.
15      Q.  You were able to rent the Lupine trails property?
16      A.  Yes.
17      Q.  Any issues in that background check?
18      A.  No.
19      Q.  Did you ask for a copy of the report?
20      A.  No.
21      Q.  Why not?
22      A.  Mr. Haining was taking care of that.
23      Q.  Mr. Haining was taking care of what?  I'm sorry.
24      A.  The negotiations on the property and the renting
25  of it.

## Page 32

1      Q.  Did you know you had the right to ask for a copy
2  of your report?
3      A.  Yes.
4      Q.  Did you request Mr. Haining to obtain a copy of
5  the report for you?
6      A.  No.
7      Q.  Did you ask the landlord what company they were
8  using?
9      A.  No.
10      Q.  Why not?
11      A.  Mr. Haining was taking care of it.  I didn't
12  think about it.
13      Q.  The property in Utah, did you rent that as well?
14      A.  Yes.
15      Q.  And were you on the application for the Utah
16  property?
17      A.  No.
18      Q.  Why not?
19      A.  I didn't need to be.
20      Q.  Why wouldn't you need to be on the application?
21      A.  They didn't require it.
22      Q.  Did you learn that from Mr. Haining?
23      A.  No.  I learned that from the manager of the
24  apartment building, because I was with Mr. Haining when we
25  were renting the apartment.

## Page 33

1      Q.  Did he suggest that you should be part of the
2  application?
3      A.  No.
4      Q.  Was there any reason you didn't offer to be part
5  of the application?
6      A.  Yes.
7      Q.  Why?
8      A.  After the Vista report, that I had gotten from
9  Mr. Raul, that -- I didn't want to have to go through that
10  again.
11      Q.  When you say "go through that again," what do you
12  mean?
13      A.  When I saw the report from Raul Ramos that he ran
14  on me, that we were afraid that it would hinder us getting
15  the apartment in Utah.
16      Q.  Were you able to get the -- rent the property
17  from Mr. Ramos?
18      A.  Yes.
19      Q.  So the report that you got from Mr. Ramos didn't
20  hinder your ability to rent that property, right?
21          MR. MARCHIANDO:  Objection.  Vague.
22          THE WITNESS:  Can you repeat that question
23  for me?
24  BY MR. RAETHER:
25      Q.  Sure.  Mr. Ramos rented to you his house, right?

Susan Elizabeth Moreland                  December 17, 2013

## Page 34

1   A.  Yes.
2   Q.  Did he -- and he did a background check on you?
3   A.  Yes.
4   Q.  And that background check didn't keep you from
5   renting that house, did it?
6   A.  No, with -- if it had not been for Mr. Haining, I
7   believe that I would not have been able to rent that
8   house.
9   Q.  Why do you believe that?
10  A.  Because my credit report and background check is
11  false.
12  Q.  What about your credit report is false?
13  A.  The credit report -- is that all one of one, are
14  you talking separate credit report and background check?
15  Or do you consider --
16  Q.  I'm asking for your -- your understanding.
17  A.  Okay.  My credit report looked to be fine.
18  Q.  So by "credit report," what do you mean?
19  A.  Previous credits, banks, car loans.
20  Q.  So that appeared to be accurate to you?
21  A.  Pretty accurate, yes.
22  Q.  So there was a part of the information that
23  Mr. Ramos provided to you which included your credit
24  report and background report that you felt was in error?
25  A.  Yes.

## Page 35

1       MR. MARCHIANDO:  Objection.  Compound.
2       You can still answer even when I object.
3   Sorry.
4       THE WITNESS:  Okay.
5       MR. RAETHER:  I forgot to include that
6   instruction.
7       THE WITNESS:  Okay.
8   BY MR. RAETHER:
9   Q.  So there was a part of the background report?
10  A.  Yes.
11  Q.  And what did you consider to be the background
12  report?
13  A.  The erroneous names that were on it, places of
14  housing was wrong, work history on it was wrong.
15  Q.  Anything else?
16  A.  Names of people that I don't know.
17  Q.  And you said you -- that you thought that
18  Mr. Haining may have clarified up something to allow you
19  to rent the property from Mr. Ramos?
20      MR. MARCHIANDO:  Objection.  Vague.
21      THE WITNESS:  His background check came out
22  a hundred percent.
23  BY MR. RAETHER:
24  Q.  Anything else that Mr. Haining did?
25  A.  In regards to?

## Page 36

1   Q.  Your ability to rent the prop-- -- house from
2   Mr. Ramos.
3   A.  No.
4   Q.  Anything else that Mr. Haining --  Strike that.
5       Did Mr. Haining have any communications with
6   Mr. Ramos about your background report?
7   A.  No.
8   Q.  Did you have any conversations with Mr. Ramos
9   about your background report?
10  A.  Initially, no.
11  Q.  So did you have conversations with Mr. Ramos
12  after he agreed to rent to you his home?
13  A.  Yes.
14  Q.  Before you rented the residence from Mr. Ramos in
15  Vista, California, you rented properties from Windsor
16  Communities?
17  A.  Yes.
18  Q.  Do you know if they ran a background check on
19  you?
20  A.  I don't believe so.
21  Q.  Did they run a credit report?
22  A.  I don't believe so.
23  Q.  So you're not sure or --
24  A.  I'm not sure.
25  Q.  When you initially rent -- I think you testified

## Page 37

1   that when you initially moved into the Windsor
2   Communities, it was managed by a different prop-- --
3   different --
4   A.  Yes.
5   Q.  -- property company at that point.  But that was
6   the 1327 --
7   A.  Yes.
8   Q.  -- apartment?
9       And you testified that Mr. Burbano rented
10  that apartment for you?
11  A.  Yes.
12  Q.  So did Mr. Burbano submit the application?
13  A.  Yes.
14  Q.  Was it joint?
15  A.  Yes.  Originally, yes.
16  Q.  And then you learned that Mr. Burbano had an
17  affair and decided he wasn't going to move in with you?
18  A.  I was renting the apartment solely for me.  And
19  he was not involved in it, just -- but signing the -- or
20  making out the initial lease -- lease for me, and then
21  when I came back I signed it.  He -- I already was going
22  through the process of divorce at that time.
23  Q.  At that time, did you have sufficient income to
24  pay the rent for 1327?
25  A.  Yes.

Susan Elizabeth Moreland                    December 17, 2013

## Page 54

1    Q.  So is the only credit report that you've seen of
2    yours the Credco credit report?
3    A.  Yes.
4    Q.  And is the only background report that you have
5    seen the one provided to Mr. Ramos by SafeRent?
6    A.  Yes.
7    Q.  You've not seen any other report on yourself?
8    A.  No.
9    Q.  Since you haven't requested a copy of your
10   background report or credit report from any other consumer
11   reporting agency, is it fair to say you don't have any
12   familiarity with their process?
13   A.  Yes.
14   Q.  So I want to turn to when you were living in the
15   Windsor Communities and you decided to move out.
16   A.  Yes.
17   Q.  Why did you decide to move out of the Windsor
18   Communities?
19   A.  The rent was too high.
20   Q.  Before you moved to -- Strike that.
21       So the last residence that you were renting
22   from Windsor Communities, was that the 1321?
23   A.  Yes.
24   Q.  Do you remember how much you were paying in rent?
25   A.  20- -- I believe it was 2450.

## Page 55

1    Q.  2,450?
2    A.  Yes.
3    Q.  That became too expensive for you and
4    Mr. Haining?
5    A.  They were getting ready to put the rent up again.
6    So yes, it was time to move.
7    Q.  Who went to look for a replacement residence?
8    A.  I did.
9    Q.  Tell me about your effort.
10   A.  Got on the computer, went to Craigslist, started
11   looking around.  I found -- I found a few on Craigslist.
12   And I really liked Raul Ramos' house.  It was very
13   attractive and plus the rent was reasonable.  So that's
14   what I was basing my -- what I was looking for in price
15   range and how the house looked.
16   Q.  So you looked at a number of different possible
17   residences in addition to the Ramos house?
18   A.  Yes.
19   Q.  Did you apply to rent any of those other
20   residences?
21   A.  No.
22   Q.  So when you moved out of Windsor Communities and
23   into the Ramos house, the only application you submitted
24   during that time was to Mr. Ramos?
25   A.  There might have been one other one.  I just

## Page 56

1    don't remember exactly.  But I just remember Raul Ramos'
2    house, yes.
3    Q.  So it's possible that there was another property
4    that you submitted an application to rent?
5    A.  I'm not sure.
6    Q.  Do you remember whether you were approved for
7    that other property?
8    A.  No.  We looked at several.  I -- I don't remember
9    if we submitted an application or not to other properties.
10   Q.  And just so the record's clear, you don't
11   remember applying to any other properties, so the answer
12   is you don't know, of course, whether you were granted or
13   denied those applications?
14       MR. MARCHIANDO:  Objection.  Compound.
15       THE WITNESS:  I don't remember.
16   BY MR. RAETHER:
17   Q.  So at some point, you went and looked at the
18   Ramos house?
19   A.  Yes.
20   Q.  Was Raul Ramos there?
21   A.  No.  It was --
22   Q.  Who showed you the house?
23   A.  We didn't get inside.  We just drove by the house
24   to see if it was the house that we were looking at on
25   Craigslist.

## Page 57

1    Q.  Do you remember when you did that?
2    A.  I -- April -- I believe it was the beginning
3    of -- end of February, beginning of March.
4    Q.  So you drove by the Ramos house, it looked
5    attractive to you.  What -- what did you do next?
6    A.  Made an appointment.
7    Q.  With Mr. Ramos?
8    A.  With Mr. Ramos to see the interior.
9    Q.  And did you make an appointment?
10   A.  Yes.
11   Q.  Do you remember what day --
12   A.  No.
13   Q.  -- the appointment occurred?
14   A.  No.
15   Q.  Approximately what --  Was it in March?
16   A.  It was in March, yes.
17   Q.  Do you remember if it was beginning, middle, end
18   of March?
19   A.  It would have been the beginning.
20   Q.  So who went to the appointment to view the Ramos
21   house?
22   A.  John Haining and I.
23   Q.  Mr. Ramos was there?
24   A.  Yes.
25   Q.  Anyone else?

Susan Elizabeth Moreland                    December 17, 2013

## Page 86

1     A. Yes.

2     Q. So if I refer to this as the Credco report, will

3 you understand that I'm referring to Exhibit 7 or

4 Exhibit 8?

5     A. Yes.

6     Q. So if you look at Exhibit 7, is that your Credco

7 credit report without the black lines?

8     A. Yes.

9     Q. So had you seen Exhibit 8 with the black lines?

10     A. Yes.

11     Q. When?

12     A. I don't remember.

13     Q. Was it recently? Or was it in 2012?

14     A. 2012, I believe.

15     Q. Do you think you saw Exhibit 8 with the black

16 lines in 2012?

17     A. Yes.

18        MR. MARCHIANDO: Objection. Vague.

19 BY MR. RAETHER:

20     Q. Ms. Moreland, it's my understanding that

21 Exhibit 7 should be the same information that's on

22 Exhibit 8 but without what's underneath the blacked out

23 portions.

24     A. Yes.

25     Q. Does that look accurate to you?

## Page 87

1     A. Yes.

2     Q. Because Exhibit 7 was produced to us by Mr. Ramos

3 and Exhibit 8 was produced to us by your counsel.

4     A. Yes.

5     Q. I want to ask you about Exhibit 7.

6     A. Yes.

7     Q. And Exhibit 7 is your Credco credit report.

8     A. Yes.

9     Q. Is that the credit report that you testified to

10 earlier that you believed was accurate?

11     A. Yes.

12     Q. And is Exhibit 7 the Credco credit report that

13 Mr. Ramos provided to you in 2012?

14     A. Yes.

15     Q. Sitting here today, is there anything inaccurate,

16 in your opinion, on Exhibit 7?

17     A. No.

18     Q. I'm going to hand to you what's been marked as

19 Exhibit 10. Have you seen Exhibit 10 before today?

20     A. I believe so.

21     Q. You're not certain whether you have?

22     A. Yes, I have.

23     Q. You have seen it?

24     A. Yes.

25     Q. And is Exhibit 10 a copy of the background report

## Page 88

1 that Mr. Ramos provided to you in 2012?

2     A. Yes.

3     Q. Looking -- if you look down at the bottom

4 right-hand corner, there's a marcation there that says

5 "12/21." Do you see that?

6     A. Yes.

7     Q. Those are actually page numbers of Exhibit 10, so

8 that will help guide us as we look through Exhibit 10.

9 Okay?

10     A. Okay.

11     Q. Looking at 12 of 21 on Exhibit 10.

12     A. Yes.

13     Q. Do you see anything inaccurate, in your opinion,

14 on this page?

15     A. No.

16     Q. If you turn to page 13 of 21 in Exhibit 10, do

17 you see anything inaccurate on page 13?

18     A. No.

19     Q. If you turn to page 14 of 21 in Exhibit 10, is

20 there anything, in your opinion, inaccurate on page 14 of

21 Exhibit 10?

22     A. No.

23     Q. Page 15 is a receipt.

24        Page 16 of Exhibit 10, it's titled "SafeRent

25 IDentify." Do you see that?

## Page 89

1     A. Yes.

2     Q. Is there anything inaccurate on page 16 of

3 Exhibit 10, in your opinion?

4     A. No.

5     Q. Turning to page 17 of Exhibit 10, anything

6 inaccurate on page 17?

7     A. Yes.

8     Q. What?

9     A. That wasn't my -- Mortenson, I was -- I'd already

10 changed my name to Burbano when I was living at Via Olivia

11 in Murrieta.

12     Q. So this is record 9 of 29? If you look to the

13 left on page 12 of 21. I'm sorry, on page 17 --

14     A. 17.

15     Q. -- of 21.

16     A. Yes.

17     Q. So that should have been Burbano instead of

18 Mortenson?

19     A. Yes.

20     Q. But at one point in time, you were Susan

21 Mortenson, right?

22     A. Yes.

23     Q. But not when you lived at the Olivia address?

24     A. No.

25     Q. But you had not yet -- when -- Okay. Did you

Coash and Coash, Inc.                    602-258-1440

Susan Elizabeth Moreland                    December 17, 2013

## Page 90

1   live at the Olivia address in 1991?
2       A.   Yes.
3       Q.   And you were not yet married to Mr. Burbano in
4   1991, right?
5       A.   Yes.
6       Q.   Because you didn't get married until 1995?
7       A.   Yes.
8       Q.   Had you legally changed your name back to
9   Moreland after you divorced Mr. Mortenson?
10      A.   Burbano.  After Mortenson and Burbano.
11      Q.   All right.  So -- but between the time that you
12  divorced Mr. Mortenson, married Mr. Burbano, you had not
13  legally changed your name back to Moreland, correct?
14      A.   Yes.
15      Q.   You had not?
16      A.   No.
17      Q.   So in 1991, you had not yet married Mr. Burbano,
18  right?
19      A.   Yes.
20      Q.   So you were still going by Mortenson then?
21      A.   Yes.
22      Q.   So there was a period of time when you were
23  living at the Olivia address that you went by Mortenson?
24      A.   No.
25      Q.   So did you live at Olivia -- did you live at the

## Page 91

1   Olivia residence in 1991?
2       A.   I don't remember.
3       Q.   I think earlier in your testimony you said that
4   you lived in the -- this would be the Murrieta address,
5   right?
6       A.   Yes.
7       Q.   And that you lived there in 1993, right?
8       A.   I believe so.
9       Q.   Okay.  At the time that you purchased the
10  Murrieta address -- Strike that.
11           At the time you purchased the Murrieta house
12  with Mr. Burbano, you had not yet been married, right?
13      A.   I was married.
14      Q.   So were you married in California?
15      A.   Yes.
16      Q.   And when you were married to Mr. Burbano, did you
17  go to the social security office to change your name?
18      A.   Yes.  With him, no.
19      Q.   Do you remember when?
20      A.   I don't remember.
21      Q.   Was it -- How soon after you were married to
22  Mr. Burbano did you go to the social security to change
23  your name?
24      A.   Probably like a week.
25      Q.   Anything else on page 17 of Exhibit 10?

## Page 92

1       A.   Yes.
2       Q.   Okay.  What else?
3       A.   Let's see.  Number 2, I never lived in Wimberly.
4       Q.   So number 5 of 29?
5       A.   Yes.
6       Q.   Do you know, is that an address associated with
7   Mr. Mortenson?
8       A.   No.
9       Q.   You don't know?
10      A.   No, I don't know.
11      Q.   Anything else?
12      A.   On this page, no.
13      Q.   So looking at page 18 of Exhibit 10, anything on
14  page 18 that, in your opinion, is inaccurate?
15      A.   Yes.
16      Q.   Can you identify those for me?  Can you identify
17  that for me?
18      A.   11 of 29.
19      Q.   And what's inaccurate?
20      A.   I've never had a P.O. box in my life.
21      Q.   Do -- do you know if Mr. Mortenson ever did?
22      A.   I don't know.
23      Q.   Anything else on page 18?
24      A.   I'm not sure of 13 of 29.
25      Q.   Not sure about what?

## Page 93

1       A.   I never lived on Altisma Way.  That would be 13
2   of 29.
3            15 of 29, never lived there.  I've never
4   been to Bakersfield.
5       Q.   Do you know an Alejandro Godinez?
6       A.   No.
7       Q.   Never did business with that person?
8       A.   Never.
9       Q.   Never came into any of the tile shops?
10      A.   No.
11      Q.   So number 16 of 29, that's Alice -- Alex Godinez,
12  that's a Bakersfield address again.
13      A.   Never.
14      Q.   You don't know an Alex?
15      A.   No.
16      Q.   Have you ever been a victim of identity theft?
17      A.   I believe so now.
18      Q.   So before getting the background report, which is
19  Exhibit 10, did you have any concerns about being the
20  victim of identity theft?
21      A.   No.
22      Q.   But after receiving Exhibit 10, you think that
23  there might be other people out there using your
24  identifiers?
25      A.   Yes.

Coash and Coash, Inc.                    602-258-1440

Page 94

1    Q.  Like your social security number?
2    A.  Yes.
3    Q.  Do you have any understanding as to how
4    Mr. Godinez might have gotten ahold of your social
5    security number?
6         MR. MARCHIANDO:  Objection.
7    Mischaracterizes the document and calls for a legal
8    conclusion.
9         THE WITNESS:  No.
10   BY MR. RAETHER:
11   Q.  Or how he could have gotten ahold of your
12   identity?
13        MR. MARCHIANDO:  Same objection.
14        THE WITNESS:  No.
15   BY MR. RAETHER:
16   Q.  So looking at page 19 of 21 --
17   A.  Yes.
18   Q.  -- there's 17, 18, and 22 are Mr. Godinez again?
19   A.  Yes.
20   Q.  And those do not belong to you?
21   A.  No.
22   Q.  And then I guess 20 was Mr. Godinez too.  So 17,
23   18, 20, and 22, on page 19 of Exhibit 10, relate to
24   Mr. Godinez and are addresses in Bakersfield.  Those do
25   not belong to you?

Page 95

1    A.  Correct.
2    Q.  And they don't relate to you?
3    A.  Correct.
4    Q.  And then 19 and 21, there's a Vicki Bertoli in
5    Huntington Beach.  Have you ever lived in Huntington
6    Beach?
7    A.  Never.
8    Q.  Do you know a Vicki Bertoli?
9    A.  No.
10   Q.  Ever do business with a Vicki Bertoli?
11   A.  Not to my knowledge.
12   Q.  Do you know how Ms. Bertoli could have gotten
13   ahold of your social security number?
14        MR. MARCHIANDO:  Objection.  Calls for a
15   legal conclusion.
16        THE WITNESS:  No.
17   BY MR. RAETHER:
18   Q.  Or how she might have gotten ahold of your
19   identifying information?
20   A.  No.
21        MR. MARCHIANDO:  Same objection.
22   BY MR. RAETHER:
23   Q.  If we look at page 20 of 21 on Exhibit 10, record
24   23 and 24 are Mr. Godinez again with Bakersfield
25   addresses.  Those don't relate to you?

Page 96

1    A.  No.
2    Q.  And record 25 is Vicki Bertoli, we talked about
3    earlier.  This time with a Garden Grove address instead of
4    a Huntington Beach address.  Have you ever lived in Garden
5    Grove?
6    A.  No.
7    Q.  If you look at 26, 27, and 28, Harry Mortenson --
8    was -- your first husband, was his middle initial E?
9    A.  Yes.
10   Q.  And was he born in 1957?
11   A.  Yes.
12   Q.  In May?
13   A.  Yes.
14   Q.  Did you live with Mr. Mortenson in San Diego?
15   A.  Yes.
16   Q.  So for record 26, 27, and 28 on page 20, and then
17   which bleeds over to page 21, and then record 29, is that
18   accurate?
19   A.  No.
20   Q.  Okay.  Which one is not?
21   A.  Gee, 26 of 29.  I never -- I never lived in -- on
22   Felspar.
23   Q.  Do you know if Mr. Mortenson ever lived there?
24   A.  Yes, he did.
25   Q.  How do you know that?

Page 97

1    A.  His mother lived there.
2    Q.  Okay.
3    A.  27 of 29, I never had a P.O. box.
4    Q.  And you don't know whether Mr. Mortenson ever
5    did?
6    A.  No, I don't.
7    Q.  Okay.  Anything else?
8    A.  No.
9    Q.  If you turn to page 21 of 21.  You see where it
10   says "Disclaimer" there?
11   A.  No.
12   Q.  So if you look -- the last text on page 21 of 21
13   on Exhibit 10.  Just to the left, right below the last
14   phone, it says "Disclaimer:"?
15   A.  Oh, yes.
16   Q.  It says, "This locator index product may be used
17   exclusively to identify potential previous names and
18   addresses the applicant may have used and to obtain the
19   applicant's date of birth and verify the applicant's
20   social security number," period.  "The results of this
21   search shall not be used directly for the purpose of
22   making employment or housing decisions," period.  Do you
23   see that?
24   A.  Yes.
25   Q.  Do you remember reading that disclaimer before

Susan Elizabeth Moreland                    December 17, 2013

## Page 98

1  today?
2     A.  Yes.
3     Q.  And what did you understand it to mean?
4        MR. MARCHIANDO:  Objection.  Calls for a
5  legal conclusion.
6  BY MR. RAETHER:
7     Q.  I'm asking for your understanding.
8        MR. MARCHIANDO:  Same objection.
9        THE WITNESS:  That -- Well, this
10 information has to be used to -- to verify where I lived.
11 BY MR. RAETHER:
12    Q.  And "shall not be used directly for the purpose
13 of making employment and housing decisions" --
14       MR. MARCHIANDO:  Same --
15 BY MR. RAETHER:
16    Q.  -- right?
17       MR. MARCHIANDO:  -- objection.
18       THE WITNESS:  That's what it says.
19 BY MR. RAETHER:
20    Q.  And Mr. Ramos rented the 808 Loma property to
21 you, right?
22    A.  Yes.
23       (Deposition Exhibit 12 was marked for
24          identification.)
25

## Page 99

1  BY MR. RAETHER:
2     Q.  Ms. Moreland, I'm going to hand to you what has
3  been marked as Exhibit 12, which is MORELAND 1 through
4  MORELAND 9.  Have you seen Exhibit 12 before today?
5     A.  Yes.
6     Q.  And there's some handwriting on Exhibit 12,
7  starts on Moreland 3, some squiggly lines.
8     A.  Yes.
9     Q.  But more predominantly on MORELAND 6 through
10 MORELAND 9.  Whose -- Have you seen that handwriting
11 before?
12    A.  Yes.
13    Q.  Is that your handwriting?
14    A.  Yes.
15    Q.  So other than the handwritten notations, is
16 Exhibit 12 -- Strike that.
17       Except for the handwritten notations and the
18 redacted portions -- in other words, the portions that
19 have black markings --
20    A.  Uh-huh, yes.
21    Q.  -- is Exhibit 12 the same as Exhibit 10?
22    A.  Exhibit 10 --
23       MR. MARCHIANDO:  Exhibit 10 is the previous
24 document.
25       THE WITNESS:  Oh.

## Page 100

1        MR. MARCHIANDO:  Objection.  The documents
2  speak for themselves.
3        THE WITNESS:  Yes.
4  BY MR. RAETHER:
5     Q.  So is Exhibit 12 the document you received from
6  Mr. Ramos?
7     A.  Yes.
8     Q.  If you look at MORELAND 3 of Exhibit 12 --
9     A.  Yes.
10    Q.  -- there's an underline underneath the phone
11 number.  Do you see that?
12    A.  Yes.
13    Q.  Did you do that?
14    A.  Yes.
15    Q.  Why?
16    A.  Don't remember.
17    Q.  Earlier you testified that page 14 of 21 was
18 accurate?
19    A.  Yes.
20    Q.  And so this underlining had nothing to do with
21 noting an inaccuracy or --
22    A.  No.
23    Q.  MORELAND 5 of Exhibit 12.  We're on Exhibit 12.
24    A.  Just checking.
25       Yes.

## Page 101

1     Q.  No handwritten notations on MORELAND 5?
2     A.  No.
3     Q.  MORELAND 6, record 5 of 29, there's an asterisk
4  circled?
5     A.  Yes.
6     Q.  Do you remember why you put an asterisk there and
7  circled it?
8     A.  Don't remember.
9     Q.  Do you remember when you made the notation for
10 record 5 on MORELAND 6?
11    A.  Yes.  It was about three weeks after we moved
12 into the house, May, first week in May.
13    Q.  So May 2012?
14    A.  Yes.
15    Q.  Any reason why you picked the report back up in
16 May of 2012?
17    A.  Several reasons.  I was looking for a job.  I was
18 very busy with the new house.  And then I got somewhat
19 sick.  When I felt a little better, I went back to the
20 process of this.
21       Meanwhile, I was on the computer
22 retaining -- trying to get information for -- for several
23 different things.
24    Q.  What different things?
25    A.  I was trying to get information on how you look

Susan Elizabeth Moreland                    December 17, 2013

---

Page 102

1   into your background, check with different agencies, how
2   to get to certain agencies to get information.
3        Q.  Can you remember what you -- So you were looking
4   on the Internet for information?
5        A.  Yes.
6        Q.  Do you remember which websites you looked at?
7        A.  I went to CoreLogic.  I don't remember all of the
8   different websites.  I was just trying to gain information
9   on how you go about fixing a bad credit report or
10  background check.
11       Q.  Do you remember what you saw on the CoreLogic
12  website?
13       A.  Really, not too much.  You would have to -- I do
14  remember you have to answer a question, then they would
15  put you through to another page.  You'd answer another
16  question regarding your issues, and just kept moving you
17  from one page to the next page.
18            I was looking for phone numbers, addresses.
19  And I believe I did find an address.
20       Q.  Were you able to find any phone numbers?
21       A.  No.
22       Q.  But you did find an address?
23       A.  I did find an address.
24       Q.  Do you remember -- So you went through the
25  CoreLogic website and could not find any phone numbers?

---

Page 103

1        A.  None.  No.  Not that I remember.
2        Q.  But you found an address.  Do you remember what
3   the address was?
4        A.  I don't have it.  I thought it was on --
5   written -- I didn't see it on here.  I must have -- I
6   don't have it anymore.
7        Q.  So "on here" you're referring to Exhibit 12?
8        A.  Yes.
9        Q.  So at some point, you wrote down the address?
10       A.  I believe so.  Normally, I'd put it on a sticky
11  note and stick it on there, but it's gone now.
12       Q.  Did you ever send any correspondence to that
13  address?
14       A.  Yes, I did.
15       Q.  How many times?
16       A.  Total, four.
17       Q.  When was the first time?
18       A.  It was around April -- March, April -- I believe
19  it was the end of April.  I don't have an exact date.  It
20  was when -- I wrote a letter when I finally found the
21  address.
22            And as you can see, that's why all of this
23  has -- these pages have been marked and -- with all my
24  noteings and everything else.  Those that are wrong, I put
25  them in an envelope with the letter, sent it to them

---

Page 104

1   requesting that they help me figure out how to fix this.
2   It's a problem.
3        Q.  Did you keep a copy of that letter?
4        A.  I don't have it, no.
5        Q.  Do you have a copy of the marked-up report, which
6   is Exhibit 12?
7        A.  Yes.
8        Q.  But not the letter?
9        A.  No.
10       Q.  Anybody help you prepare that letter?
11       A.  No.
12       Q.  Did you review that letter with anyone before you
13  sent it?
14       A.  No.
15       Q.  Did you show the April letter to anyone before
16  you sent it?
17       A.  No.
18       Q.  And you cannot remember what address you sent it
19  to?
20       A.  I do not remember.
21       Q.  So you think that was April 2012?
22       A.  Yes.
23       Q.  Earlier you testified that you marked up
24  Exhibit 12 in May of 2012?
25       A.  Uh-huh.

---

Page 105

1        Q.  Yes?
2        A.  Yes.
3        Q.  I'm trying to reconcile the difference --
4   discrepancy between sending the letter with the marked-up
5   report and the time when you testified that you marked up
6   the report.
7        A.  I don't clearly remember exact dates.
8        Q.  Did you ever get a response to your -- we'll call
9   it the April letter?
10       A.  No.
11       Q.  So you sent another correspondence?
12       A.  Yes.  On the -- I believe on the -- the website.
13  Like I said, to get into the website, you had to go
14  through what your issues were, what your problems are, and
15  I finally got to a page, of several times trying to get in
16  there, to the website, that I actually filled out a form.
17  And within the -- you know, the correspondence of sending
18  it to them through the computer.
19       Q.  So this is something you --
20       A.  To their email address.
21       Q.  I'm sorry.
22       A.  Okay.
23       Q.  This is something you could electronically
24  submit?
25       A.  Yes.

---

Susan Elizabeth Moreland                    December 17, 2013

## Page 106

1    Q.  Do you remember what the form was for?
2    A.  To air your grievances and to get information.
3    Q.  Do you remember what the email address was?
4    A.  No.
5    Q.  Did you make a copy of the email?  Did you print
6  it out?
7    A.  I -- Not a copy, no.  Paper copy, no.
8    Q.  Do you have an electronic copy of the email?
9    A.  Do not.
10   Q.  Did you check for it?
11   A.  It's not on my new computer.
12   Q.  Anybody see you send the email?
13   A.  No.
14   Q.  Anybody help you draft it?
15   A.  No.
16   Q.  Anybody help you review it?
17   A.  No.
18   Q.  You don't have any record of the email?
19   A.  No.
20   Q.  Do you remember when it was sent?
21   A.  Don't remember, no.
22   Q.  Approximately how long after the first letter?
23   A.  It had to have been -- credit report -- I think
24  it had to have been around the same date in -- I'm going
25  to say May.

## Page 107

1    Q.  May of 2012?
2    A.  Yes.
3    Q.  Did you ever get a response to the May email?
4    A.  No.
5    Q.  Did you ever look into why?
6    A.  Yes.
7    Q.  What did you do?
8    A.  Well, got onto, like I say, different websites to
9  see if, again, I could find telephone numbers.  And I'm
10  not sure if this telephone number right here is related to
11  CoreLogic.  It says "credit report," where I have written
12  down.
13   Q.  So you're looking at MORELAND 8 in Exhibit 12?
14   A.  Yes.
15   Q.  Towards the top of the left-hand corner it says
16  "Credit Report 1-800-680-7289"?
17   A.  Yes.
18   Q.  That's the number you're referring to?
19   A.  Yes.
20   Q.  You don't recall if that was a number associated
21  with CoreLogic?
22   A.  Like I say, I was checking everyone.  I called
23  the IRS.  I called social security.  And I called FDCC, I
24  reported with them on their website.  And at that time, I
25  was -- you know, I was extremely upset.  So I'm really not

## Page 108

1  sure of all the dates and times and when I -- when I
2  started and ended all this.
3         Oh, at the top right-hand corner, 4-6-12.
4    Q.  What does that mean?
5    A.  That's -- is when I started calling all of these
6  different numbers, you know, the IRS, the social security,
7  the credit report, and then the FDCC.  So all of this is
8  related to that date.
9    Q.  What is the FDCC?
10   A.  It's the federal -- I'm trying to think --
11  federal -- it's the trade commission.  And they call it
12  FDCC.  That's what all of I can think of right now.
13   Q.  So how did you decide to call the FDCC, the IRS,
14  and the Social Security Administration?
15   A.  Because when I saw this report, it scared me.  I
16  was scared to death that people were getting into -- well,
17  things would have been changed for the IRS, my social
18  security.  I wanted to find out if I could change my
19  number, how, you know, to go about correcting the issues
20  that I'm seeing on this paperwork.
21   Q.  You were concerned about identity theft?
22   A.  Most definitely.
23   Q.  And you were looking to those agencies for
24  assistance with respect to possible identity theft?
25   A.  Yes.

## Page 109

1    Q.  Did you do research on the Internet to help guide
2  you in dealing with possible identity theft?
3    A.  Yes.
4    Q.  Is that how you came to focus in on the IRS?
5    A.  Yes.
6    Q.  Social Security Administration?
7    A.  Yes.
8    Q.  And the FDCC?
9    A.  Yes.
10   Q.  What other -- Do you recall what websites you
11  went to?
12   A.  No, I don't.
13   Q.  Do you recall what other guidance you received
14  from the websites you visited in terms of addressing
15  possible identity theft?
16   A.  Yes.  I basically stumbled upon -- is it
17  Francis & Mailman?
18   Q.  That's one of the firms that's representing you
19  in this case?
20   A.  Yes.
21   Q.  And when did you come across Francis & Mailman?
22   A.  I don't have an exact date.  It was around
23  April -- I believe at the end of April.  I don't have an
24  exact date.
25   Q.  2012?

Susan Elizabeth Moreland                    December 17, 2013

## Page 122

1  Q. Did he prescribe you any medication?
2  A. Yes, he did.
3  Q. What did he prescribe?
4  A. The same medication that I'm taking now.
5  Q. And what is that?
6  A. Do I have to give that out? I mean, is it --
7  Q. I'd like to know what medication you're on.
8  A. Okay. It's -- it's G-a-b- --- G-a-b- --- I'm
9  trying to see if the -- the name's on here.
10     No, I don't. It's -- it's hard to pronounce
11 it. G-a-b-i-n-t-i-n-a, Gab- -- yeah, Gabintin. Gabitin,
12 G-a-b- --
13    Q. Is your claim that your frus- -- is your -- is
14 your claim that -- in this case, do you claim that as part
15 of your damages that you seek from CoreLogic is your
16 diagnosis of having trigeminal neurology?
17        MR. MARCHIANDO: Object to form.
18        THE WITNESS: That's -- that's not where
19 this started out, no.
20 BY MR. RAETHER:
21    Q. So as part of your claim against CoreLogic for
22 actual damages, does it relate to your diagnosis of
23 trigeminal neurology?
24        MR. MARCHIANDO: Same objection.
25        THE WITNESS: I don't know at this time.

## Page 123

1  BY MR. RAETHER:
2     Q. Why not?
3     A. Because it was never a thought.
4         My first thought is, when I started all
5  this, that my background check, everything, would be taken
6  care of. That's all I want was just this mess cleaned up.
7     Q. We talked about the letter that you sent in
8  April-May 2012 and then the email?
9     A. Yes.
10    Q. And you mentioned there were two other --
11    A. Yes.
12    Q. -- correspondence --
13    A. Yes.
14    Q. -- attempts with CoreLogic. What was the third
15 one?
16    A. It was paperwork that I filled out, that you can
17 retrieve from the Internet. But I couldn't find it, so my
18 lawyers found it for me. So I filled it all out. I
19 copied my driver's license, sent them a copy of, I
20 believe, other identifications. I had to take it to the
21 post office -- well, first, I copied it all. Then went to
22 the post office, had it registered, paid for that, and
23 mailed it to them. And never got -- how you're supposed
24 to receive a receipt back in the mail, I never received --
25 I never got any communications with them returned.

## Page 124

1     Q. So you never received the returned receipt from
2  the post --
3     A. No, never did.
4     Q. -- postal office?
5     A. No.
6     Q. Did you inquire as to why?
7     A. Yeah. You -- you can get online and you check
8  and it just -- there was nothing there. It was delivered.
9  It says it was delivered.
10    Q. Did you make a copy -- so you said you made a
11 copy of the paperwork?
12    A. Yes.
13    Q. Did you keep a copy of that?
14    A. No, I did not.
15    Q. Do you remember when you --
16    A. That was an accident. My -- what do you say --
17 my -- my copy machine at home had ran out of ink. So
18 basically I just put it in envelopes and sent them out.
19    Q. So you did not make a copy?
20    A. I did not, no.
21    Q. Did you keep a copy of your receipt from the
22 postal office?
23    A. Yes.
24    Q. Do you still have that?
25    A. Yes.

## Page 125

1         MR. RAETHER: Has that been produced, Craig?
2  I don't -- I haven't seen that.
3         MR. MARCHIANDO: No.
4         THE WITNESS: Yes.
5         MR. MARCHIANDO: Receipt from the post
6  office?
7         THE WITNESS: Yeah. Sorry.
8         MR. RAETHER: Maybe at a break you can go
9  back and see if you can find that for me.
10        THE WITNESS: We emailed it to you, scanned
11 it.
12 BY MR. RAETHER:
13    Q. You said you went online to check on the delivery
14 of the package?
15    A. Yes.
16    Q. Did you take a print of that screen? Did you
17 print it out?
18    A. I don't believe I did.
19    Q. Did you send the paperwork to anyone else besides
20 CoreLogic?
21    A. Yes.
22    Q. Who?
23    A. Francis.
24    Q. You sent a copy to Francis & Mailman?
25    A. Yes.

Susan Elizabeth Moreland                    December 17, 2013

## Page 126

1    MR. RAETHER: Craig, I haven't seen this
2    package of materials.
3    BY MR. RAETHER:
4    Q.  Do you remember when?
5    A.  No, I don't.
6    Q.  Approximately what year?  Was it in 2012 or 2013?
7    A.  2012.
8    Q.  Do you remember if it was in the fall or the
9    summer?
10   A.  Summer, I believe.
11   Q.  Did you ever get a response from CoreLogic?
12   A.  No.
13   Q.  Did you call or write CoreLogic after sending the
14   packet of information?
15   A.  No.
16   Q.  Earlier -- earlier you testified as to four times
17   that you communicated --
18   A.  Uh-huh.
19   Q.  -- with CoreLogic.
20   A.  Uh-huh.
21   Q.  We talked about the letter in April-May 2012 --
22   A.  Uh-huh.
23   Q.  -- the email, and then you just referenced this
24   packet --
25   A.  Uh-huh.

## Page 127

1    Q.  -- which is three.
2        Was there a fourth?
3    A.  Again, there was another email.  That I went in
4    and tried to get back into the same website that I was in,
5    but I couldn't maneuver my way through.  So I just started
6    filling everything out again and sent it back in.  So
7    that's four.
8    Q.  Do you remember when you sent that email?
9    A.  March -- March, April, May -- that was in June.
10   Q.  June 2012?
11   A.  Yes.
12   Q.  Do you remember what email address you sent it
13   to?
14   A.  No, I don't remember.
15   Q.  Did you print out a copy of the email?
16   A.  No.
17   Q.  Did anyone help you prepare the email?
18   A.  No.
19   Q.  Anybody review it?
20   A.  No.
21   Q.  Anyone see it before you sent it?
22   A.  No.
23   Q.  Any other communications with CoreLogic, that you
24   can remember, attempted communications, besides those
25   four?

## Page 128

1    A.  No.
2    Q.  After you retained Francis & Mailman in
3    April 2012, did you go online from that point to try to
4    solve things on your own?
5    A.  No.
6    Q.  You're relying on your counsel from that point?
7    A.  Yes.
8    Q.  Anything else that you can think of that you did
9    in terms of trying to address the identity theft issues or
10   your concerns relative to the background report?
11   A.  No.
12       THE WITNESS:  Can we take a break pretty
13   soon here?
14       MR. RAETHER:  Let's take a break now.
15       THE VIDEOGRAPHER:  We are off the record.
16   The time on the video monitor is 12:22.  This concludes
17   disk two.
18       (A recess ensued.)
19       THE VIDEOGRAPHER:  We are on the record.
20   The time on the video monitor is 12:42.  This begins disk
21   three.
22   BY MR. RAETHER:
23   Q.  Ms. Moreland, is there anything about the
24   testimony you've given so far today that you would like to
25   change or correct?

## Page 129

1    A.  No.
2    Q.  We were talking, before we went down a long side
3    road, about Exhibit 12.
4    A.  Yes.
5    Q.  We started off talking about the handwritten
6    entry for record 5 of 29 on MORELAND 6 of Exhibit 12.
7    A.  Yes.
8    Q.  There's a handwritten notation there that says
9    "no X filed for divorce" underlined, "filed for divorce"
10   being underlined.
11   A.  Uh-huh.
12   Q.  Yes?
13   A.  Yes.
14   Q.  What did you mean by that?
15   A.  I'm really not sure.  I don't remember.  Oh, but
16   see I put -- I put a "no," so that was misinformation
17   right there.
18   Q.  Did you have knowledge that Mr. Mortenson was
19   living in Wimberly, Texas?
20   A.  Mr. Mortenson?
21   Q.  Yes, ma'am.
22   A.  No.
23   Q.  Next to 6 of 29, it says "OK yes"?
24   A.  Yes.  That was --
25   Q.  What did --

Susan Elizabeth Moreland                                    December 17, 2013

---

Page 130

1    A.  That was -- that was my address.

2    Q.  So that was correct?

3    A.  I did live there, yes.

4    Q.  And 7 of 29 it says "OK Yes," means the same

5    thing?

6    A.  Yes.

7    Q.  8 of 29 says "P.O. box question no."

8    A.  That's correct.

9    Q.  And then it says "lived in Mexico, did not open"?

10   A.  "Lived in Mexico, did not open" -- oh, yes,

11   that's -- that was referring to the P.O. box.  I never had

12   a P.O. box.

13   Q.  And the -- the writing appears to be a little bit

14   lighter in the "lived in Mexico, did not open."  Did you

15   write that at the same time that you made the other

16   notations?

17   A.  I don't think so.  Don't think so.

18        Oh, and then the other question, "Mortenson"

19   is spelled wrong.  So instead of -O-N -- yeah, it's -E-N.

20   Q.  Do you remember when you made these notations?

21        Let me ask a different --

22   A.  4-12 -- yeah --

23   Q.  Go ahead, I'm sorry.

24   A.  Go ahead.

25   Q.  I just want my question to be a little bit more

---

Page 131

1    specific.

2    A.  Sure.

3    Q.  I said "these notations."  I don't want there to

4    be ambiguity in my question.

5        So the notation that is with 8 of 29, for

6    P.O. box question mark no, do you remember when you made

7    that notation?

8    A.  No.

9    Q.  Was it the same time --  Did you mark up

10   Exhibit 12 in one sitting or did you do it in multiple

11   sittings?

12   A.  Multiple.

13   Q.  Do you remember what -- over what period of time?

14   A.  It was probably within days.

15   Q.  So April or May 2012?

16   A.  Yes.  Because I read it, reread it, going through

17   to make sure that I had not missed anything.

18   Q.  Have you looked at Exhibit 12 since May 2012?

19   A.  No.  Because it gets me upset.

20   Q.  Then 8 of 29, towards the bottom it says "plus my

21   name was Burbano."  Does that relate to 8 or number 9?

22   A.  Let's see.  "Plus my name was Burbano," that's

23   referring to 8 of 29.

24   Q.  And then 9 of 29 you crossed out Susan E.

25   Mortenson?

---

Page 132

1    A.  Yes.

2    Q.  And then above it you wrote "Okay."  What did you

3    mean by that?

4    A.  12/91 -- I don't remember.  I crossed out the

5    name.  I -- I put the OK, I believe, is because I put

6    Susan Burbano.  And, yes, I did live at Via Olivia,

7    Murrieta.

8    Q.  So you have an okay to the right of the

9    Murrieta --

10   A.  Yes.  Yes.

11   Q.  -- address.  And there's also an okay above

12   Susan E. Mortenson?

13   A.  I don't think I meant that.  I meant -- because I

14   scratched out the "Mortenson" and I put, for my own

15   reference, "Susan Burbano."

16   Q.  And then for 10 of 29, looks like it's -- there's

17   a written -- it's written "okay" to the right?

18   A.  Yes.

19   Q.  Looking at Moreland 7 of Exhibit 12, right above

20   11 of 29 it says "Maried Mexico"?

21   A.  Yes.

22   Q.  Although "married's" misspelled?

23   A.  Oh.  Believe me --

24   Q.  So was "divorced" on the other one, but . . .

25   A.  Oh, I -- I scribble things.  So just -- yeah.

---

Page 133

1    Q.  What did you mean by that notation?

2    A.  Probably because I was looking at the date, and I

3    didn't see from -- because there's no names on here.  So I

4    was looking -- I think maybe from the previous page --

5    okay.  Diamond was okay.  I just put -- I put that down

6    just for my own reference.

7    Q.  So does that notation relate to any particular

8    record?

9    A.  Yes, I was married and I was living in Mexico at

10   that time.

11   Q.  But in terms of the records 11 of 29 through 16

12   of 29 listed on MORELAND 7 of Exhibit 12, does that

13   notation relate specifically to any of those?

14   A.  No.

15   Q.  11 of 29 on MORELAND 7, there's an asterisk

16   beside P.O. box 99320?

17   A.  Right.

18   Q.  What did you mean by that?

19   A.  Just probably referenced to check it.  And I

20   did -- what I did do is I went into Harry Mortenson's

21   background on the Internet to see if there was any P.O.

22   boxes.  Because normally you just get general information

23   on people, addresses and things like that, and I wanted to

24   check and see if that was his P.O. box.

25   Q.  And when did you do that?

---

Susan Elizabeth Moreland                    December 17, 2013

Page 134

1   A.  The same time I was filling these out, that would
2   be April -- April, May.
3   Q.  Do you know what --
4   A.  In between.
5   Q.  April or May 2012?
6   A.  Yes.
7   Q.  Do you remember what service you used?
8   A.  Yes, I do.  I went into -- first of all, I went
9   into the Yellow Pages looking for Harry Mortenson, who
10  lives in Las Vegas.  And then you go into -- actually, the
11  Yellow Pages has an area where you can go in and do a
12  brief background check on them and it gives -- gives out
13  information.
14  Q.  So you were on a website on the Internet that was
15  a Yellow Pages website?
16  A.  Uh-huh.
17  Q.  And it offered you a tool to go and do further
18  investigation?
19  A.  Yes.
20  Q.  Did you have to pay for that?
21  A.  No.
22  Q.  Were you required to sign a contract to get that
23  information?
24  A.  No.  It's -- it's a very short -- like I said,
25  brief.  If you want more information, then you have to get

Page 135

1   in there, sign up for it, pay it.  I was not going to
2   do that.  I don't pay for anything over the Internet.
3       So yeah, like I said, it was very brief and
4   it just gives certain information.  I did get back in
5   there, found out that he did live in Las Vegas, which I
6   really didn't know and really don't care.  But just
7   checking to see if there was any previous addresses on
8   here, like P.O. boxes and things like that.  That's
9   how . . .
10  Q.  Did you -- Were you able to determine whether
11  this P.O. box was owned by Mr. Mortenson?
12  A.  No.  I did not find -- I did not find any P.O.
13  boxes.
14  Q.  You were able to go on the Internet and find his
15  current address?
16  A.  Yes.
17  Q.  Record 12 of 29, it says "okay" question mark.
18  Do you see that?
19  A.  Uh-huh.
20  Q.  Yes?
21  A.  Yes.
22  Q.  Why is there a question mark?
23  A.  Oh, it was probably because the name is spelled
24  wrong -- I'm sorry -- spelled wrong.
25  Q.  So it's --

Page 136

1   A.  -O-N.
2   Q.  -- supposed to be -O-N?
3   A.  Uh-huh.
4   Q.  Any other reason?
5   A.  I don't think so.  Because, yes, I did live on
6   Diamond, apartment 2055.
7   Q.  And at that time, your name was Susan Mortenson?
8   A.  Yes, it was.
9   Q.  13 of 29, there's a "no" to the right.
10  A.  Uh-huh.
11  Q.  Yes?  And that means what?
12  A.  I'm sorry.  Carlsbad -- I don't remember that
13  address.
14  Q.  You couldn't remember whether you lived there or
15  not?
16  A.  I -- it -- it's not familiar to me at all.  But I
17  do have a que-- you know, I did have a question on that.
18  Q.  Then 14 of 29 you have "Harry" written above
19  Susan E. Mortenson?
20  A.  Uh-huh.
21  Q.  Yes?
22  A.  Uh-huh.
23  Q.  You have to answer yes.
24  A.  Yes, I'm sorry.  Yes.
25  Q.  Why did you write "Harry" above your name?

Page 137

1   A.  That was -- the reason is because I believed he
2   lived on Altisma Way.  I, again, say that I don't believe
3   I lived there.  So I believe this is his address.
4   Q.  That was his mother's address?
5   A.  No.  That's after our divorce, I believe.
6   Q.  But you can't be absolutely certain that you
7   never lived at Altisma Way?
8   A.  No.
9   Q.  So 15 of 29 says asterisk "no Mexico" on the
10  right side.  Is that because the entry doesn't belong to
11  you and you were living in Mexico during that time?
12  A.  Right.
13  Q.  Same thing --
14  A.  Yes.
15  Q.  -- with 16 of 29?
16  A.  Yes.
17  Q.  Then the same notation on MORELAND 8 can be found
18  to the right of records 17 through 22?  They say "no,
19  lived in Mexico" or --
20  A.  Yes.
21  Q.  -- "Mexico"?
22  A.  Yes.
23  Q.  And those records do not relate to you because
24  you were living in Mexico?
25  A.  Yes.

Susan Elizabeth Moreland                    December 17, 2013

## Page 150

1    A.  I don't remember.
2    Q.  Did you receive any documentation from the IRS or
3  the Social Security Administration?
4    A.  No.
5    Q.  Back to Exhibit 12.
6    A.  Yes.
7    Q.  So MORELAND 9, record 23 through 26, to the
8  right, has the -- has a notation "No.  Lived in Mex"?
9    A.  Yeah, Mexico.
10   Q.  What did you mean by that?
11   A.  Well, I was living in Mexico when all of this
12 occurred -- most of it, anyhow.  I don't remem- -- yeah,
13 '92.  Yeah.  Yep.  '86.  Okay.
14   Q.  I had, from the prior testimony, you said that
15 you moved to Mexico in 1993.
16   A.  I think that might be wrong.  I believe it was
17 '90.
18   Q.  '90?
19   A.  Yes, 1990.  I lived there 10 years.  We came back
20 in 2000.  So 10 years, yeah.
21   Q.  So now you think you lived in Mexico from 1990 to
22 2000?
23   A.  Yes.
24   Q.  So your prior testimony that you lived there from
25 1993 to 2003, is that wrong?

## Page 151

1    A.  Yes.
2    Q.  And the Baccharis address, before you testified
3  you lived there for two years?
4    A.  Uh-huh.  Yes.
5    Q.  Is that still true?
6    A.  Yes.
7    Q.  You only lived there two years?
8    A.  Yes.
9    Q.  So you moved out in 2002?
10   A.  Yes.
11   Q.  If you look, 26 of 29, right there it says
12 "A-R-O-N" and then "N-O-V-A-C-K" and then the numbers
13 215-735-8600.  Do you see that?
14   A.  Yes.
15   Q.  What does that relate to?
16   A.  I don't -- Aron Novack -- that might be from
17 maybe one of the previous phone calls that I made.  I
18 don't -- I don't know what it's related to exactly.
19   Q.  Do you remember talking to an Aron Novack?
20   A.  I don't remember.
21   Q.  And you have no recollection today of Aron
22 Novack?
23   A.  None.
24   Q.  If you look at 27 of 29, it says asterisk SSN and
25 then the number sign, no, did not live there --

## Page 152

1    A.  Did not live there.
2    Q.  -- divorced?
3    A.  Yes.
4    Q.  Did I read that correctly?
5    A.  Yes.
6    Q.  What did you mean by that?
7    A.  Harry Mortenson.
8    Q.  That's your former husband?
9    A.  Yes.  And I believe that I was divorced at that
10 time.  So this P.O. box -- I mean -- did not belong to me.
11   Q.  Do you know why you wrote "SSN#"?
12   A.  No, I do not.
13   Q.  And likewise, for 28 of 29, you wrote "SSN#"?
14   A.  Yes, I do remember.  I thought, when I read this,
15 that Harry Mortenson was using my social security.
16   Q.  Did you find out whether he had been?
17   A.  No, I did not.
18        (Deposition Exhibit 14 was marked for
19        identification.)
20 BY MR. RAETHER:
21   Q.  Ms. Moreland, I'm going to hand to you a document
22 that's been marked as Exhibit 14, which is a document from
23 my client CoreLogic SafeRent.
24   A.  Thank you.  Yes.
25   Q.  Have you seen Exhibit 14 before today?

## Page 153

1    A.  Yes.
2    Q.  And it's dated October 19, 2012.  Do you see
3  that?  Page -- the first page of Exhibit 14.
4    A.  Yes.
5    Q.  And there's a signature on Exhibit 14.  Is that
6  your signature?
7    A.  Yes.
8    Q.  Do you remember preparing the letter which is
9  Exhibit 14?
10   A.  Yes.
11   Q.  And it says -- it's addressed to CoreLogic
12 SafeRent, 12395 First American Way, Poway, California
13 92064.
14   A.  Yes.
15   Q.  Do you see that?
16   A.  Yes.
17   Q.  Do you know where you got that address from?
18   A.  Yes.
19   Q.  Where?
20   A.  Mailman, my attorneys.
21   Q.  Don't -- don't even say anything else.
22        So from Francis & Mailman?
23   A.  Yes.
24   Q.  Did you write the letter which is Exhibit 14?
25   A.  No.

Susan Elizabeth Moreland                    December 17, 2013

Page 154

1    Q.  Who wrote the letter?
2    A.  Francis & Mailman.
3    Q.  So they sent you this letter and asked you to
4    send it?
5    A.  Yes.
6    Q.  You already had a copy of your report that
7    Mr. Ramos provided to you, right?
8    A.  Yes.
9    Q.  And initially, what you wanted was to correct the
10   information in that report, right?
11   A.  Yes.
12   Q.  Why, in October of 2012, were you asking for a
13   copy of your report?
14        MR. MARCHIANDO:  Objection.  I'll instruct
15   you not to answer if it will reveal attorney-client
16   communications.
17        THE WITNESS:  Sorry.
18   BY MR. RAETHER:
19   Q.  So you did it at the instruction of your
20   attorney?
21   A.  Yes.
22   Q.  And you don't have any personal opinion as to
23   why?
24   A.  Yes, I do.
25   Q.  Why?

Page 155

1        MR. MARCHIANDO:  The same objection.  If you
2    can't answer without revealing attorney-client
3    communications, don't answer.
4    BY MR. RAETHER:
5    Q.  So Exhibit 14 you sent at the direction of your
6    attorneys?
7    A.  Yes.
8    Q.  Asking for the information that your attorneys
9    wanted you to ask for?
10   A.  Yes.
11   Q.  All that SafeRent CoreLogic has in its file are
12   the two pages that are Exhibit 14.  Do you remember
13   sending Exhibit 14?
14   A.  Yes.
15   Q.  Was there anything else in Exhibit 14?
16   A.  Yes.
17   Q.  What?
18   A.  Information that -- I believe it was regarding
19   the background check.
20   Q.  What information regarding -- what
21   specifically -- what background check?
22   A.  The one from CoreLogic SafeRent, the -- yeah, the
23   background check, this one.  The one that I'm trying to
24   fix.
25   Q.  Earlier you testified that you sent that in April

Page 156

1    or May 2012, and this letter is dated October 19th.  And
2    in your prior testimony, you didn't mention an
3    October 19th letter, right?
4    A.  Exactly.  But I was talking about my personal
5    letter that I sent in, plus my emails that I sent.
6    Q.  Did you provide a copy to your attorneys of what
7    you sent to CoreLogic on October 19th, which is
8    Exhibit 14?
9    A.  I don't remember.
10   Q.  Did you keep a copy?
11   A.  I do not have a copy.
12   Q.  You don't remember if you sent a copy to your
13   attorneys Francis & Mailman?
14   A.  I might have.
15        MR. RAETHER:  We -- Craig, we haven't --
16        THE WITNESS:  I don't remember.
17        MR. RAETHER:  -- gotten this letter or,
18   frankly, any of the other correspondence that your client
19   allegedly sent to CoreLogic SafeRent.
20   BY MR. RAETHER:
21   Q.  Earlier I asked you if you ever remember getting
22   any responses from CoreLogic SafeRent.  And I think your
23   testimony was no?
24   A.  Correct.
25        (Deposition Exhibit 15 was marked for

Page 157

1        identification.)
2    BY MR. RAETHER:
3    Q.  I'm going to hand you what's been marked as
4    Exhibit 15, which is a document that CoreLogic SafeRent
5    provided to me.  It's a document dated January 16th, 2013.
6    And it's addressed to Susan Moreland, 808 Loma Alta
7    Terrace, Vista, California 92083.
8    A.  Uh-huh.
9    Q.  Is that --
10   A.  Yes.
11   Q.  Yes?
12   A.  Yes.
13   Q.  Is that where you were living on January 16th?
14   A.  Yes.
15   Q.  But you don't remember getting Exhibit 15 in the
16   mail?
17   A.  No.
18   Q.  Any reason -- Did you have any issues with
19   getting mail when you lived in Loma Alta?
20   A.  Yes.
21   Q.  What -- what issues did you have with getting
22   mail?
23   A.  I don't remember specifically.  I do remember --
24   I know Mr. Haining had issues with mail.  Because of when
25   I filed online to change our address to Loma -- 808 Loma

Coash and Coash, Inc.                    602-258-1440

Susan Elizabeth Moreland                              December 17, 2013

## Page 162

1  to CoreLogic?
2        MR. MARCHIANDO: Objection. Vague.
3        THE WITNESS: I am trying to get my
4  background check resolved and the things that are on there
5  not -- refer -- well, for me, to take them off, to get it
6  resolved.
7  BY MR. RAETHER:
8        Q. So for you individually, this case is about
9  correcting the information in Exhibit 12?
10       A. Yes.
11       MR. MARCHIANDO: Objection. Misstates
12  testimony. Sorry.
13  BY MR. RAETHER:
14       Q. And that's why you asked Francis & Mailman to
15  represent you, to get that corrected?
16       A. Yes.
17       MR. MARCHIANDO: Same objection.
18  BY MR. RAETHER:
19       Q. And your understanding, that's what they're
20  pursuing in this case?
21       A. Yes.
22       MR. MARCHIANDO: Objection.
23  BY MR. RAETHER:
24       Q. Anything else about the complaint or this case,
25  based on your review of Exhibit 18?

## Page 163

1        A. No.
2        Q. Do you understand that this case is being brought
3  by you as a representative of a punitive class?
4        A. Yes.
5        Q. Do you -- do you have an understanding of who
6  you're seeking to represent?
7        A. Yes.
8        Q. Who?
9        A. The whole -- everyone that is involved and other
10  people that have the same issues.
11       Q. What issue?
12       A. Of background checks being misleading and wrong
13  and not being able to get them fixed in a timely manner.
14       Q. Not being able to get things corrected?
15       A. Corrected, yes.
16       Q. Anything else?
17       A. No.
18       Q. Do you understand what your obligations are in
19  terms of being a class representative?
20       A. Yes.
21       Q. Do you understand that's more than what's
22  required if you were just to bring this case individually?
23       A. Yes.
24       Q. And what do you understand those additional
25  obligations to be?

## Page 164

1        MR. MARCHIANDO: Objection. Calls for a
2  legal conclusion.
3  BY MR. RAETHER:
4        Q. I'm asking for your understanding.
5        MR. MARCHIANDO: Same objection.
6        THE WITNESS: My understanding is that,
7  again, as a whole, as a group, that these issues with
8  background checks, credit checks, need to be resolved and
9  fixed for -- for me and for everyone else.
10  BY MR. RAETHER:
11       Q. If you can turn to page 7 of Exhibit 18. And I'm
12  looking at paragraph 37 on page 7.
13       A. Yes.
14       Q. Have you read that before today? Have you
15  focused in on paragraph 37?
16       A. I've read this, yes.
17       Q. And it says that plaintiff made a request in
18  writing on or about October 18, 2012, a request that
19  defendant received on or about October 25, 2012. Do you
20  see that?
21       A. I see -- Okay, plaintiff, October -- yes.
22       Q. And I haven't seen a document produced by you
23  showing a writing to CoreLogic dated October 18, 2012. Do
24  you think that date's right?
25       A. Yes.

## Page 165

1        Q. How do you know that?
2        I'm just wondering --
3        A. It --
4        Q. -- because earlier I asked you about --
5        A. It should be -- yes, it should be on the receipt
6  for -- for the return receipt on the mail.
7        Q. The one that you don't believe you have anymore?
8        A. No, I have it.
9        Q. Oh, you have it?
10       A. Yes.
11       Q. Earlier when you were testifying, you mentioned
12  four written communications with CoreLogic, all of which
13  happened before October 2012.
14       A. Yes.
15       Q. Is this one that you didn't mention in your prior
16  testimony?
17       MR. MARCHIANDO: Objection. Document speaks
18  for itself. Misstates testimony.
19  BY MR. RAETHER:
20       Q. I want to understand the basis for this
21  allegation. The facts had to come from somewhere. Did
22  they come from you, Ms. Moreland?
23       A. Yes.
24       Q. And so what's the basis for alleging that you
25  sent a writing on or about October 18th, 2012 --

Coash and Coash, Inc.                        602-258-1440

Susan Elizabeth Moreland                    December 17, 2013

## Page 174

1  difficulties?" And you marked no?
2      A.  Yes.
3      Q.  Was that true?
4      A.  Yes.
5      Q.  And then if you look at the last page, that's
6  your signature again?
7      A.  Yes.
8      Q.  Last page of Exhibit 20.
9      A.  Yes.
10     Q.  Exhibit 21, have you seen that document before
11 today?
12     A.  Yes.
13     Q.  And what is Exhibit 21?
14     A.  It's verified that all the information that they
15 received was true.
16     Q.  And that's your signature on Exhibit 21?
17     A.  Yes, it is.
18     Q.  It's dated, again, June 18, 2013?
19     A.  Uh-huh.  Yes.
20     Q.  It also -- did -- Did you read this at the time
21 you signed it on June 18, 2013?
22     A.  No, I didn't.
23     Q.  When did you read it?
24     A.  I don't believe I ever read it.
25     Q.  But you signed it?

## Page 175

1      A.  I did.
2      Q.  And you attested that the statements were true?
3      A.  Yes.
4      Q.  It also says here that you authorize Shockness
5  Property Group or its affiliates to request and obtain a
6  tri-merge credit report?
7      A.  Yes.
8      Q.  See that?
9      A.  Yes.
10     Q.  Do you know if Shockness did?
11     A.  I don't know.
12     Q.  Did you ask them who they were going to obtain
13 the tri-merge credit report from?
14     A.  I never dealt -- I don't know.  I never dealt
15 with Shockness Property Group.
16     Q.  You left that to Mr. Haining?
17     A.  Yes, I did.
18        MR. RAETHER:  I have no further questions.
19 I appreciate your time today, Ms. Moreland.
20        MR. MARCHIANDO:  I have a couple of
21 questions.
22
23        EXAMINATION
24 BY MR. MARCHIANDO:
25     Q.  Ms. Moreland, are your attorneys communicating

## Page 176

1  with you about what's happening in this lawsuit?
2      A.  Yes.
3      Q.  I think your testimony earlier was that --  Well,
4  let me ask it this way.
5         Are you seeking any -- other than --  Strike
6  that.  Let me start over.
7         Other than seeking to have your credit
8  report -- Strike that too.
9         Other than having -- seeking to have your
10 SafeRent background report cleaned up, are you seeking
11 anything else from this lawsuit?
12     A.  Yes, I am.
13     Q.  What is that?
14     A.  The stress and the emotion and everything that's
15 happened to me and as I feel that the report has damaged
16 me in looking -- or seeking employment.  But since I've
17 been so sick that I'm not looking for employment right
18 now.  Because I feel the stress of this has made me sick,
19 that I can't -- I can't look for a job, can't drive
20 anymore, except for maybe five minutes, you know, to the
21 grocery store and back.  And that's about it.  I can't do
22 any other driving than that.
23        Like today, I have to get a taxi back and
24 forth and that's -- that hasn't been me.  And this also
25 started since I got the report from Raul Ramos.

## Page 177

1      Q.  Have you incurred any out-of-pocket expenses
2  related to this lawsuit?
3      A.  Many, yes.
4      Q.  Or related to your communications with SafeRent?
5      A.  Yes.
6      Q.  Some examples?
7      A.  Driving all over the place to get copies made,
8  mailing, mailing expenses.  And, you know, being sick.  I
9  have no health insurance, out-of-pocket money for doctors,
10 medications, which are extremely expensive.
11     Q.  And when your attorneys are communicating with
12 you about this lawsuit, are you responsive?
13     A.  Yes.
14        MR. MARCHIANDO:  I'll reserve the rest of
15 our questions.
16        MR. RAETHER:  I just have a few more
17 questions, Ms. Moreland.
18        THE WITNESS:  Yes.
19
20        FURTHER EXAMINATION
21 BY MR. RAETHER:
22     Q.  So earlier you testified that you were not
23 seeking damages in this case, correct?
24     A.  Yes.
25     Q.  And we took a break.  Did you go out and talk

Susan Elizabeth Moreland                    December 17, 2013

---

## Page 194

1  stress and emotional.  What did you mean by that?

2          MR. MARCHIANDO:  Objection.  Compound.

3          THE WITNESS:  Loss of hair, really no sleep,

4  just everyday stress, headaches, depression.  Just

5  everyday drama.

6  BY MR. RAETHER:

7      Q.  What kind of everyday drama?

8      A.  Oh, just knowing, you know, that this is out

9  there -- it's out there, people are looking at it.  They

10 don't know if I'm a bum, somebody just, you know, real

11 flighty, not very grounded, it bothers.  And people using

12 my name, my social security number, that's extremely

13 stressful.

14     Q.  For what period of time?

15     A.  The whole time since I found -- found out about

16 it.

17     Q.  So even after you decided not to submit a police

18 report, the identity theft has still been bothering you?

19         MR. MARCHIANDO:  Objection.  Compound.

20         THE WITNESS:  Yes.

21 BY MR. RAETHER:

22     Q.  And you still haven't submitted a police report?

23         MR. MARCHIANDO:  Objection.  Vague.

24         THE WITNESS:  I did not.

25

---

## Page 195

1  BY MR. RAETHER:

2      Q.  And on your application to Shockness Property

3  Group, you checked that there wasn't anything in your

4  report that you thought would be troubling?

5          MR. MARCHIANDO:  Objection.

6  Mischaracterizes document.

7  BY MR. RAETHER:

8      Q.  Nothing that you would expect in your credit

9  report in terms of past or current difficulties?

10         MR. MARCHIANDO:  Same objection.

11         THE WITNESS:  That question is misleading.

12 BY MR. RAETHER:

13     Q.  Do you have any other stress in your life,

14 Ms. Moreland, besides the Sa- -- what's -- addresses and

15 names in a SafeRent IDentify Report?

16         MR. MARCHIANDO:  Objection.  Compound.

17         THE WITNESS:  No.

18 BY MR. RAETHER:

19     Q.  Financially, you guys are doing well?

20     A.  We're doing okay, yes.

21         MR. RAETHER:  All right.  No other

22 questions.  Thank you.

23         MR. MARCHIANDO:  We'll reserve the rest of

24 our questions.

25         THE VIDEOGRAPHER:  We are off the record.

---

## Page 196

1  The time on the video monitor is 2:31.  This concludes

2  disk three and this concludes the deposition.

3          (The deposition was concluded at 2:31 p.m.)

4

5                  SUSAN ELIZABETH MORELAND

---

## Page 197

1  STATE OF ARIZONA    )

2  COUNTY OF MARICOPA  )

3          BE IT KNOWN the foregoing deposition was

4  taken by me pursuant to stipulation of counsel; that I was

5  then and there a Certified Reporter of the State of

6  Arizona, and by virtue thereof authorized to administer an

7  oath; that the witness before testifying was duly sworn by

8  me to testify to the whole truth; notice was provided that

9  the transcript was available for signature by the

10 deponent; that the questions propounded by counsel and the

11 answers of the witness thereto were taken down by me in

12 shorthand and thereafter transcribed into typewriting

13 under my direction; that the foregoing pages are a full,

14 true, and accurate transcript of all proceedings and

15 testimony had and adduced upon the taking of said

16 deposition, all to the best of my skill and ability.

17     I FURTHER CERTIFY that I am in no way related to

18 nor employed by any parties hereto nor am I in any way

19 interested in the outcome hereof.

20     DATED at Phoenix, Arizona, this_____day of

21 _____, 2013.

22

23

24

25          Meri Coash, RMR, CRR

            Certified Reporter #50327

---