# EXHIBIT 9



# Compressed Transcript of the Testimony of
# **JASON DOYLE-CONFIDENTIAL, 2/5/14**

**Case:** Moreland v. Corelogic Saferent, LLC

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Page 1

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SUSAN E. MORELAND,          :
      Plaintiff,  : Case No.:
vs.            : SACV13-00470 AG (ANx)
CORELOGIC SAFERENT, LLC,  :
      Defendant.  :
            - - -
CONFIDENTIAL TRANSCRIPT
            - - -
      Oral deposition of JASON DOYLE held at the
Law Offices of Morrison & Foerster, LLP, 1650 Tysons
Boulevard, Suite 400, McLean, Virginia 22102, on
Wednesday, February 5, 2014, commencing at 2:09 p.m.
taken by and before Janice Jones, Registered
Professional Reporter and Notary Public.

            - - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters & Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

Page 2

1  APPEARANCES:
2
3     Francis & Mailman, P.C.
4     BY:  JAMES A. FRANCIS, ESQUIRE
5     AND LAUREN BRENNAN, ESQUIRE
6     Land Title Building - 19th Floor
7     100 South Broad Street
8     Philadelphia, PA 19110
9     (215) 735-8600
10    Email:  jfrancis@consumerlawfirm.com
11        lbrennan@consumerlawfirm.com
12    REPRESENTING THE PLAINTIFF
13
14    Faruki, Ireland & Cox, PLL
15    BY:  RONALD I. RAETHER, JR., ESQUIRE
16    500 COURTHOUSE PLAZA, S.W.
17    10 North Ludlow Street
18    Dayton, Ohio 45402
19    (937)-227-3733
20    Email:  rraether@ficlaw.com
21    REPRESENTING THE DEFENDANT
22
23            - - -
24
25

Page 3

1          I N D E X
2
3  WITNESS                          PAGE
4  JASON DOYLE
5    By Mr. Francis              4
6
7            - - -
8
9        E X H I B I T S
10 Number                        Marked
11 P-1    Service Agreement-My Rental    76
12 P-2    Document-SR31-SR43            80
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          (It is hereby stipulated and
2     agreed by and between counsel for the
3     respective parties that filing, sealing,
4     and certification are waived; and that
5     all objections, except as to the form of
6     the question, are reserved to the time
7     of trial.)
8            - - -
9          JASON DOYLE, having been duly
10    sworn/affirmed, was examined as follows:
11            - - -
12          EXAMINATION
13            - - -
14 BY MR. FRANCIS:
15    Q    Sir, good afternoon.  My name is Jim
16 Francis.  We were just introduced.  I'm an attorney,
17 and I represent the plaintiff in this action that has
18 been brought against Corelogic Saferent.
19          Today I'm going to be taking your
20 deposition.
21          Have you ever been deposed before?
22    A    I have not.
23    Q    You have not.  All right.  Well, let me
24 give you the proper introduction as to how the process
25 works.

                    1  (Pages 1 to 4)

Moreland v. Corelogic Saferent, LLC                    JASON DOYLE-CONFIDENTIAL, 2/5/14

| Page 5 | Page 7 |
|---|---|

**Page 5**

1        If I ask you a question at any time and you
2  do not understand it, please let me know, and I will be
3  happy to rephrase it in a way that makes sense to you.
4        Otherwise, I will assume that you
5  understood my question and that you are answering it to
6  the best of your ability.
7        Do you understand that?
8     A   I do.
9     Q   All right.  If, at any point, during the
10  deposition you conclude that an answer that you gave
11  previously was incorrect, inaccurate, not wholly
12  truthful or you think it needs to be supplemented in
13  some way because it doesn't -- the way it came out does
14  not sound right, let me know and I will be happy to
15  stop the deposition and let you make that correction on
16  the record.
17        Do you understand that?
18     A   I do.
19     Q   All right.  Great.  Even though we are not
20  here in the courtroom in which this case might try and
21  the judge is not sitting here, the jury is not sitting
22  here, your testimony equally as it would be then is
23  subject to the penalty of perjury.
24        Do you understand that?
25     A   I do.

**Page 6**

1     Q   Do you know of any reason why you would be
2  unable to testify truthfully, accurately and/or
3  completely today as a result of some type of medical
4  infirmity or influence of medication?
5        Do you know of any reason why you could not
6  testify truthfully here today?
7     A   No.
8     Q   No.  All right.  The official version of
9  this deposition is what the court reporter is taking
10  down.
11        You and I will talk.  We will go back and
12  forth.  We might even every once in a while talk over
13  each other accidentally.
14        It's very important, though, that any
15  answer that you give be given in a verbal fashion
16  because the only thing that is being taken down today
17  is what we say.
18        Do you understand that?
19     A   I do.
20     Q   All right.  I will try to wait until you
21  are finished answering your question and, likewise, try
22  to wait until I'm absolutely finished asking my
23  question before you respond; because the court reporter
24  can only take down one of us at a time and if we talk
25  over each other, it really is frustrating for them and

**Page 7**

1  it does not create a complete record.
2        It sounds like an obvious instruction but
3  sometimes I'm thinking of my question as I'm phrasing
4  it.  I'm not sitting here maybe as a new lawyer would
5  just reading off of a sheet.  I'm thinking of the
6  questions as I am going through.
7     A   Yes.
8     Q   Are you employed?
9     A   I am.
10     Q   Who are you employed by?
11     A   Corelogic.
12     Q   How long have you been employed by a
13  Corelogic type company?
14     A   Since 2002.
15     Q   What is your position at Corelogic?
16     A   My current position is director of product
17  management.
18     Q   I'm sorry.  I didn't ask you this before;
19  would you please just for the sake of the record state
20  and spell your full name?
21     A   Jason Doyle, J-A-S-O-N; last name,
22  D-O-Y-L-E.
23     Q   How long have you held the position of
24  director of product management?
25     A   About a year.

**Page 8**

1     Q   All right.  Do you work out of an office
2  maintained by the company or do you work from home?
3     A   I do both.
4     Q   You do both.  What is the address of the
5  office that you work out of?
6     A   It just moved the other day, so I don't
7  know the address.  The other -- the old address was at
8  Calhoun Place in Rockville.
9     Q   All right.
10     A   But literally within the last day or so we
11  moved.
12     Q   Are you still in Rockville?
13     A   Yeah, we are.  I actually haven't been to
14  the new office yet because of this.
15     Q   All right.  Good.  How long did you work
16  out of the immediately preceding office?
17     A   Since 2004.
18     Q   2004.  All right.  Now before you mentioned
19  that you joined the company in 2002.
20        Correct?
21     A   Yeah.
22     Q   Was it Corelogic then or was it a different
23  version?
24     A   It was -- back then it was not a Corelogic
25  entity.  It was call The Registry.

2  (Pages 5 to 8)

Page 21

1   important for you to know, how is my client going to
2   use this product?
3         A    I do consider it important.
4         Q    All right.  Is one of the reasons that you
5   consider it important because, at least for some of the
6   products that you sell, the products are regulated by
7   the Fair Credit Reporting Act, and you need to know the
8   client's purpose for using the information?
9         A    That is one of the reasons.
10        Q    Yes.  All right.  In connection with
11  communicating the value of the products that you
12  oversee, which the company sells, do you use any either
13  written marketing materials or web presence to convey
14  the value of the products?
15        A    Yes, we do.
16        Q    What do you use or how do you use marketing
17  materials or the web to do that?
18        A    We use our website to convey to the client
19  what we offer, so My Rental dot com would convey the
20  purpose of the service, benefits of the product.
21        Q    All right.  And is My Rental dot com a URL
22  that is owned and operated by Corelogic Saferent?
23        A    It is owned and operated by Corelogic
24  Saferent.
25        Q    Focusing specifically upon the small

Page 22

1   landlord market or segment -- what do you call it the
2   small landlord --
3         A    I call it the small landlord market, small
4   landlord segment.
5         Q    All right.  Focusing upon the small
6   landlord segment or market, can you outline for me what
7   products you oversee the sale of?
8         A    The specific products --
9         Q    Yes.
10        A    -- inside of the service?
11        Q    Yes.
12        A    I oversee the specific products of our
13  eviction report, our multi-state criminal report, our
14  tenant score, our terrorist fugitive report, our
15  previous adverse history report, our statewide criminal
16  report, our county criminal report, our multi-state sex
17  offender.
18             I think that checks off the box of the
19  products -- oh, inside of the small landlord service,
20  we also offer a credit report.
21        Q    Would that be credit reports that are
22  resold --
23        A    Yes.
24        Q    -- from the big three?
25        A    Yes, they are.  Actually, we get it from

Page 23

1   one bureau.
2             MR. RAETHER:  Just wait for the questions.
3   BY MR. FRANCIS:
4         Q    All right.  Just to be clear, the products
5   that you oversee include the evictions reports.
6             Correct?
7         A    Correct.
8         Q    Multi-state criminal reports.
9             Correct?
10        A    (Indicating.)
11        Q    Tenant score?
12        A    Yes.
13        Q    Tenant fugitive -- no, excuse me --
14  terrorist fugitive?
15        A    Terrorist fugitive.
16        Q    Previous address?
17        A    Yes.
18        Q    Statewide crim?
19        A    Yes.
20        Q    County crim?
21        A    Yes.
22        Q    Multi-state sex offender?
23        A    Yes.
24        Q    And credit reports?
25        A    Yes.

Page 24

1         Q    Great.  Now, do some clients buy just some
2   of those products as opposed to all of them?
3         A    Sure.  Yes.
4         Q    And then other clients buy all of them.
5             Correct?
6         A    I wouldn't say that.  They would buy a
7   package or a bundle.
8         Q    A package?
9         A    They would not order three packages.
10        Q    I see.  I have nine different products that
11  you listed.  You have packages and bundles of
12  selections of those products?
13        A    That's correct.
14        Q    Depending upon what that client's needs
15  are, correct, or the pricing?
16        A    It's not dependent upon what their needs
17  are.  It's dependent upon how we have the system set up
18  with different service levels.
19             We have it arranged for packages but, yes,
20  each package presents a different opportunity for them
21  to meet different needs.
22        Q    All right.  For example, in this case, did
23  you review any documents pertaining to a relationship
24  that the company has with Mr. Ramos?
25        A    Any documents?

6  (Pages 21 to 24)

Page 25

1      Q     Did you prepare in any way for this
2   deposition?
3      A     Yes.
4      Q     Can I ask you what that preparation -- did
5   you review documents that the company produced in this
6   case?
7      A     Yes.
8      Q     Among those documents that you have
9   reviewed, did you review an agreement or a contract
10  between Raul Ramos and Corelogic Saferent?
11     A     I believe I was shown the service
12  agreement, yes.
13     Q     So, using that service agreement as an
14  example -- and I'm going to ask you questions about
15  that in a bit -- what is the bundle of products that
16  the company supplies to Mr. Ramos?
17        MR. RAETHER:  Objection to form.
18  BY MR. FRANCIS:
19     Q     You can answer.
20     A     The actual bundle that he received?
21     Q     Yes.
22     A     Was bundle two.
23     Q     Bundle two.
24     A     Inside service level one.
25     Q     Bundle two inside service level one?

Page 26

1      A     Correct.
2      Q     When you say "service level," what does
3   that pertain to?
4      A     It pertains to what the client can receive
5   based on certain compliance requirements.
6        So level one has certain requirements to
7   attain that level and what they can -- if the client
8   can attain that level, they can order reports at that
9   level.
10     Q     All right.
11     A     If they can pass their compliance
12  requirements to get to level two, they can obtain
13  reports at level two, and so on and so forth.
14     Q     I understand.  How many different service
15  levels are there?
16     A     There are three.
17     Q     I got it.  In terms of more access than
18  less, does it go one to three or three to one?
19     A     One is less; three is more.
20     Q     All right.  Within service level one, what
21  types of information can the client access?
22     A     They can access criminal data, eviction
23  data and our address report.
24     Q     Within service level one, how many bundles
25  are there?

Page 27

1      A     There are three.
2      Q     I'm sorry.  Go ahead.
3      A     There are -- in the current service or when
4   this person ran the report?
5      Q     That is a great point of clarification.
6   Both; so let's look at when this person ran the report?
7      A     There are three -- three bundles.
8      Q     Now how many are there?
9      A     There are two bundles.
10     Q     Just to be clear -- because you pointed out
11  an important distinction and that is -- when you say
12  this person ran, so for the sake of the record and
13  clarity, you mean when Mr. Ramos obtained information
14  concerning the plaintiff in this case, Ms. Moreland.
15        Correct?
16     A     That's correct.
17     Q     What were the three bundles at that point?
18     A     Inside of level one, bundle one, two,
19  three, the third bundle would have included everything
20  that bundle two had, which Mr. Ramos ran; in addition,
21  bundle three would have included the check verification
22  report to see if there were any fraudulent activities
23  on checks.
24     Q     All right.  Has that been eliminated?
25     A     It has.

Page 28

1      Q     Why is that?
2      A     Low usage.
3      Q     All right.  Currently, how do bundles one
4   and two differ within service level one?
5      A     Okay.  Bundle one would have, I believe,
6   our eviction report and our previous address; bundle
7   two would have those same reports, and it would also
8   tack on multi-state crim and sex offender.
9      Q     All right.
10     A     It adds on the criminal component.  So
11  bundle one, eviction, address history; bundle two,
12  would add on the crim.
13     Q     And the product that Mr. Ramos obtained and
14  was using in connection with Ms. Moreland's application
15  was bundle two of service level one.
16        Correct?
17     A     Correct.
18     Q     So it included criminal and multi-state
19  crim search, as well.
20        Right?
21     A     Yes.  Yes.
22     Q     Now, what information would typically be
23  contained within service level two?
24     A     Everything service level one has and we add
25  on our tenant score, our proprietary tenant risk score.

7 (Pages 25 to 28)

**Moreland v. Corelogic Saferent, LLC**     **JASON DOYLE-CONFIDENTIAL, 2/5/14**

Page 41

1     Q    Which one?
2     A    The fugitive report.
3     Q    I know.  Was that a Saferent product?
4     A    Yes.
5     Q    All right.  The next product that you
6  mentioned was something called previous addresses.
7           Correct?
8     A    Yes.
9     Q    Is that the technical term that the company
10  uses for that product, previous addresses?
11     A    We use the term previous address history on
12  the My Rental dot com platform, because it's a more
13  generic term for that market.
14           The actual name of the report that is our
15  internal name is Saferent Identify.
16     Q    To your knowledge, how long has the company
17  sold that product?
18     A    As long as I can remember.
19     Q    Was that a Saferent product prior to its
20  merger acquisition with Corelogic?
21     A    Yes.  That product was a product that was
22  in the fold prior to Corelogic.
23     Q    All right.  What are the purposes that that
24  product is used for?
25     A    That product is used to broaden the scope

Page 42

1  of a search.  It's used to -- it's used for a client to
2  run what I call a drill-down report, so a client could
3  see that a person has lived at a particular location
4  for a certain stretch of time; that they could say I
5  want to run a drill-down report and they could use that
6  to run a county criminal report or a statewide report.
7     Q    All right.  Like the other products that we
8  have been discussing so far, is it used in connection
9  with a consumer applying for an apartment or a lease?
10           MR. RAETHER:  Objection to form.
11  BY MR. FRANCIS:
12     Q    You can answer.
13     A    Yes.
14     Q    And what type of data is contained within
15  the previous address history product?
16     A    The address report would return, first
17  name, last name; it would return date of birth; it
18  would return addresses; it would return aliases; it
19  would return a social number but it would be masked.
20  Maybe the first couple of digits would be there but
21  there would be Xs after that.
22     Q    First name, last, date of birth, address,
23  aliases, social -- anything else?
24     A    At the top of the report, there may be the
25  actual information on who is running the report, but

Page 43

1  the core of the report, I believe that is what it
2  offers.
3     Q    Where does your company get the data that
4  it includes in a Saferent Identify report?
5     A    We actually don't get that -- we don't pull
6  that from in-house data -- from our databases.  It's
7  pulled from a vendor.
8     Q    Who is the vendor?
9     A    I know of one, Lexis-Nexus.
10     Q    All right.  Is there another?
11     A    There is but I do not recall the name or
12  know the name.
13     Q    Do you know whether or not the name of that
14  other vendor is U.S. Search?
15     A    I do not.
16     Q    Or U.S. Info Search?
17     A    I do not.
18     Q    Just to be clear, when you say that the
19  company uses a vendor for the Saferent Identify
20  product, does that mean that at the time a search is
21  made that the company will then go to the vendor at
22  that point in time and get that data or do you mean to
23  suggest that the company gathers a bulk of data in
24  advance, has it in its own database and then fulfills
25  the request with reference to its own database?

Page 44

1           Does that make any sense?
2     A    Yeah, I understand your question.  I
3  believe --
4           MR. RAETHER:  Objection to form.
5     A    I believe it is gathered in realtime.  It's
6  not something that we have a database of archived data
7  that we pull from.
8  BY MR. FRANCIS:
9     Q    All right.  I understand.  The next
10  database -- or excuse me -- the next product that you
11  mentioned was statewide crim.
12           Can you tell me about that product?
13  Specifically, what is it used for?
14     A    Statewide crim is versus a multi-state
15  report where a collection of states are run at once.
16           A statewide report is isolated to that
17  single state, and it may actually even hit different
18  databases in the multi-state search.
19     Q    How would that be?  And the reason I ask
20  that is, if the multi-state database search queries all
21  of the courts at the time of the search, how is the
22  state crim search reaching courts that weren't queried
23  in the first place?
24           MR. RAETHER:  Objection to form.
25     A    It's a misnomer when you run a

11  (Pages 41 to 44)

Page 69

1        MR. FRANCIS:  Here.
2        MR. RAETHER:  All right.
3        MR. FRANCIS:  The top is red.
4        THE WITNESS:  Okay.
5   BY MR. FRANCIS:
6        Q    What does that phrase pertain to?  Is that
7   a terminology that Corelogic Saferent uses to define
8   certain types of products?
9        A    Registry Check is our internal -- it's the
10  marketing and name for our eviction report.  It's the
11  actual brand name for the eviction report.
12       Q    So, typically, in a Registry Check Report,
13  this is where you would see somebody's eviction
14  history?
15       A    That's correct.
16       Q    If they had one?
17       A    If they had one.
18       Q    Under that, at the bottom of that, there is
19  a reference to screen by AppAlert in paren SM.
20       Do you see that?
21       A    I do.
22       Q    What does AppAlert refer to?
23       A    AppAlert is the internal marketing name for
24  our fugitive and terrorist alert report.
25       Q    All right.  Go ahead.

Page 70

1        If you turn down to SR33, on the top of
2   that page is a heading "Multi-State Criminal Search
3   Report".
4        Obviously, that is what we have discussed
5   before in terms of multi-state crim.
6        Right?
7        A    That is true.
8        Q    At the bottom of that, there is a report
9   disclaimer with language in small font, but it is all
10  capitalized.
11       Do you see that?
12       A    I do.
13       Q    Did you write any of that language?
14       A    I did not.
15       Q    All right.  If you would turn to SR34,
16  please; at the top of this page, there is a heading,
17  Saferent Identify paren TM end of paren.
18       Do you see that?
19       A    I do.
20       Q    Can you tell me what Saferent Identify TM
21  refers to?
22       A    Once again, Saferent Identify is the
23  marketing name for the address history report.
24       Q    All right.  And the information that is
25  contained here on Pages SR34, SR35, SR36, SR37, SR38

Page 71

1   and SR39, that information would have come from
2   Lexis-Nexus.
3        Correct?
4        MR. RAETHER:  Objection to form.
5        A    That is correct.
6   BY MR. FRANCIS:
7        Q    All right.  Would you turn to SR40, please?
8        Can you identify this part of the report or
9   record?
10       A    Yes, this --
11       MR. RAETHER:  Objection to form.
12  BY MR. FRANCIS:
13       Q    You can answer.
14       A    This is a payment receipt that we create
15  for the client so they can see what was charged to
16  their card.
17       Q    So this would be something that would
18  appear on every single report that was fulfilled.
19       Correct?
20       A    No.
21       Q    No?
22       A    I believe if you look back on payment
23  receipt, they can click that actual document.  It
24  creates -- it does not add on to each report.
25       Q    I see.

Page 72

1        A    You know, it's a standalone piece of paper.
2        Q    All right.  You are referring to SR 31.
3   Correct?  I mean, you were just holding that, just for
4   the record?
5        A    Yes.  Correct.  The payment receipt, it's a
6   very visible way on the summary page to give them a
7   chance to print a receipt if they are so inclined.
8        Q    All right.  Then here, the sales amount of
9   $53.98, that represents the total payment for the
10  bundle of products that Mr. Ramos ordered.
11       Correct?
12       A    It does.  It includes two applicants.  It
13  doubles the price because there were two applicants.
14       Q    All right.  Would you now turn to SR41,
15  please?  I'm sorry, SR 42.
16       Do you recognize that document?
17       A    I sure do.
18       Q    Can you tell me what that is, please?
19       A    It's an adverse action letter.  If the
20  client chooses to decline a tenant, this is a document
21  that they would send to them indicating that they were
22  declined and gives them steps to contact Saferent if
23  they have any issues.
24       Q    All right.  Does your company, as part of
25  any of its services to its client, either prepares

18  (Pages 69 to 72)

**Moreland v. Corelogic Saferent, LLC**  **JASON DOYLE-CONFIDENTIAL, 2/5/14**

Page 73

1 adverse action letters to the client or sends adverse
2 action letters to the client as an add-on service?
3     MR. RAETHER: Objection to form.
4     A   Not that I'm aware of. I can speak to My
5 Rental. Inside My Rental, we make it available, an
6 adverse letter, but they don't send it out
7 automatically.
8 BY MR. FRANCIS:
9     Q   All right.
10     A   It's available for our client if they elect
11 to use it.
12     Q   So it will generate one for them so that if
13 they want to send it, they can click and print it out
14 or -- who sends it?
15     A   It would be our client that would send it;
16 so Ramos, in this case, could print this out and he
17 could fax it, mail it, hand it to someone.
18     Q   All right. So your client was the one that
19 actually created this letter.
20     Correct?
21     MR. RAETHER: Objection to form.
22 BY MR. FRANCIS:
23     Q   Not your client. I'm sorry. The portal
24 creates that.
25     Correct?

Page 74

1     A   Correct. The portal will add in to the
2 template here the name.
3     Q   Right.
4     A   You know, "Dear Applicant" so that they can
5 send that note out if they chose to. Our system does
6 not automatically kick it out. Our client makes the
7 decision to accept or not to accept.
8     Q   But the "My Portal Dot Com" website and
9 platform, which is owned by Corelogic Saferent, it
10 creates the adverse action letter?
11     MR. RAETHER: Objection to form.
12     A   Yes. The adverse action letter is created
13 on the My Rental Dot Com platform.
14 BY MR. FRANCIS:
15     Q   Right. When in time is it created in
16 reference to the fulfillment of the products?
17     A   They would not be able to see this until
18 they got to a page like a summary page where they have
19 all of the reports available.
20     When this was run in 2012, there would have
21 been a link someplace on this page that said view
22 adverse action letter, boom; it's like a link and it
23 would show them that; it would show them a pop-up
24 window that they could print.
25     Q   I see. Now is an adverse action letter

Page 75

1 generated in connection with every application?
2     A   Yes, I believe so.
3     Q   So, is it your testimony that as a routine
4 or programmed part of the products that are delivered
5 for the client the system generates an adverse action
6 letter if the client wants to use it?
7     A   That is accurate.
8     Q   Did you have any involvement in drafting or
9 designing the adverse action letter?
10     A   I did not.
11     Q   All right. Focusing on -- are you good?
12 Do you need a break?
13     A   No, I'm fine.
14     Q   Focusing on SR34, let's get back to that.
15     You testified before that the information
16 contained within the Saferent Identify section of the
17 report would have come from Lexis-Nexus.
18     Correct?
19     A   Sure.
20     MR. RAETHER: Objection to form.
21 BY MR. FRANCIS:
22     Q   Correct?
23     A   Correct.
24     Q   Do you know what information Corelogic
25 Saferent would have had to provide to Lexis-Nexus in

Page 76

1 order to retrieve this information?
2     A   No.
3     Q   Do you know what the search -- the matching
4 criteria is at Lexis-Nexus for delivering the
5 information that is here?
6     A   I do not.
7     Q   Do you know the minimum search criteria at
8 all in any way regarding what information is required
9 from Lexis-Nexus in order for it to deliver information
10 in a Saferent Identify request like this?
11     A   I know a social security number is
12 required.
13     Q   Beyond that do you know anything --
14     A   I do not.
15     MR. FRANCIS: Mark this as Doyle 1, please.
16     COURT REPORTER: Yes.
17     (Thereupon, the document was marked as
18 Deposition Doyle Exhibit Number 1 for identification.)
19 BY MR. FRANCIS:
20     Q   Mr. Doyle, I'm handing you a document that
21 has been marked as Doyle 1.
22     Please take a moment to look through it,
23 and let me know when you have had an opportunity to
24 review it.
25     Have you had an opportunity to look at the

19 (Pages 73 to 76)

**Moreland v. Corelogic Saferent, LLC**                    **JASON DOYLE-CONFIDENTIAL, 2/5/14**

---

Page 85

1    MR. FRANCIS:  All right.  That is fine.
2    Sir, thank you very much.  I appreciate it.
3    (Deposition concluded at 4:23 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 86

1              CERTIFICATE OF NOTARY
2
3        I, JANICE JONES, the officer before whom the
4    foregoing deposition was taken, do hereby certify that
5    the witness whose testimony appears in the foregoing
6    deposition was duly sworn by me; that the testimony of
7    said witness was taken by me in stenotype and
8    thereafter reduced to typewriting under my direction;
9    that said deposition is a true record of the testimony
10   given by said witness; that I am neither counsel for,
11   related to, nor employed by any of the parties to the
12   action in which this deposition was taken; and,
13   further, that I am not a relative or employee of any
14   counsel or attorney employed by the parties thereto,
15   nor financially or otherwise interested in the outcome
16   of this action.
17
18
19              JANICE JONES
20              Notary Public in and for the
21              Commonwealth of Virginia
22              Registration No. 7566898
23
24   My Commission Expires:
25   March 31, 2017

---

Page 87

1    INSTRUCTIONS TO WITNESS FOR READING & SIGNING
2         Read your deposition over carefully.  It
3    is your right to read your deposition and make
4    changes in form or substance.  You should assign a
5    reason in the appropriate column on the errata
6    sheet for any change made.
7         After making any changes in form or
8    substance which have been noted on the following
9    errata sheet along with the reason for any change,
10   sign your name on the errata sheet and date it.
11        Then sign your deposition at the end of
12   your testimony in the space provided.  You are
13   signing it subject to the changes you have made in
14   the errata sheet, which will be attached to the
15   deposition before filing.  You must sign it in
16   front of a witness.  Have the witness sign in the
17   space provided.  The witness need not be a notary
18   public.  Any competent adult may witness your
19   signature.
20        Return the original errata sheet to your
21   counsel promptly.  Court rules require filing
22   within 30 days after you receive the deposition.
23
24
25

---

Page 88

1              ERRATA SHEET
2    Attach to Deposition of: Jason Doyle
3    Taken on: February 5, 2014
4    In the matter of: Moreland v. Corelogic Saferent, LLC
5    PAGE  LINE NO.  CHANGE REASON
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

22  (Pages 85 to 88)

**Moreland v. Corelogic Saferent, LLC**                                      **JASON DOYLE-CONFIDENTIAL, 2/5/14**

Page 89

```
 1          SIGNATURE PAGE
 2
                   - - -
 3
 4       I hereby acknowledge that I
 5   have read the aforegoing transcript, dated
 6   February 5, 2014, and the same is a true and
 7   correct transcription of the answers given by
 8   me to the questions propounded, except for
 9   the changes, if any, noted on the errata
10   sheet.
11                 - - -
12
13   SIGNATURE: _____
                  Jason Doyle
14
15   DATE:         _____
16
17   WITNESSED BY: _____
18
19
20
21
22
23
24
25
```

23  (Page  89)