# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN E. MORELAND, on behalf of herself and all others similarly situated,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>CORELOGIC SAFERENT, LLC,,<br><br>　　　　Defendant. | Case No.<br>SACV 13-00470 AG (ANx) |

\*\*CONFIDENTIAL\*\*

VIDEOTAPED DEPOSITION OF SUSAN ELIZABETH MORELAND

Phoenix, Arizona

December 17, 2013

Prepared by:

Meri Coash, RMR, CRR

Certified Realtime Reporter

(Copy)　　　　　　　　　　　　Certified Reporter #50327

Page 2

```
 1              I N D E X
 2  WITNESS                                    PAGE
 3  SUSAN ELIZABETH MORELAND
 4
        Examination by Mr. Raether              7
 5
        Examination by Mr. Marchiando         176
 6
        Further Examination by Mr. Raether    177
 7
 8
 9            EXHIBITS MARKED
10  EXHIBITS       DESCRIPTION              FIRST
                                          REFERENCE
11
    Exhibit 1   Rental Application            58
12              MORELAND 000022-28
13  Exhibit 2   Rental Application            60
                RAMOS 000001-26
14              CONFIDENTIAL
15  Exhibit 3   Residential Rental Agreement  76
                MORELAND 000012-21
16
    Exhibit 4   Email chain ending with email from  80
17              Ronald Raether to Donald Burton
                dated 12-3-13
18              RAMOS000049-51
19  Exhibit 7   Credco Instant Merge Credit Report  85
                for Susan Burbano dated 4-4-12
20
    Exhibit 8   Credco Instant Merge Credit Report  85
21              for Susan Burbano dated 4-4-12
                MORELAND 000029-37
22
    Exhibit 10  Lease Decision dated 4-4-12   87
23
    Exhibit 11  Voluntary Petition            38
24
    Exhibit 12  Lease Decision dated 4-4-12   99
25              MORELAND 000001-9
```

Page 3

```
 1  Exhibit 13  Federal Trade Commission complaint  142
                confirmation
 2              MORELAND 000011
 3  Exhibit 14  Letter from Susan Moreland to       152
                CoreLogic SafeRent dated 10-19-12
 4
    Exhibit 15  Letter from CoreLogic SafeRent to   157
 5              Susan Moreland dated 1-16-13
 6  Exhibit 16  Complaint Class Action Susan E.     159
                Moreland vs. CoreLogic, Inc.
 7              Case No. SACV13-00470 AG (ANx)
 8  Exhibit 17  First Amended Complaint Class       160
                Action Susan E. Moreland vs.
 9              CoreLogic, Inc.
                Case No. SACV13-00470 AG (ANx)
10
    Exhibit 18  Second Amended Complaint Class      160
11              Action Susan E. Moreland vs.
                CoreLogic, Inc.
12              Case No. SACV13-00470 AG (ANx)
13  Exhibit 19  Plaintiff's Rule 26(a) Initial      168
                Disclosures Susan E. Moreland vs.
14              CoreLogic, Inc.
                Case No. SACV13-00470 AG (ANx)
15
    Exhibit 20  Shockness Property Group            172
16              Residential Lease Application
17  Exhibit 21  Shockness Property Group signature  174
                page
18
19
20            REQUESTS
21         Page 119   Line 6
22
23
24
25
```

Page 4

```
 1        INSTRUCTIONS NOT TO ANSWER
 2         Page  48    Line 19
 3         Page 154    Line 15
 4         Page 155    Line  2
 5         Page 178    Line  7
 6         Page 180    Line 20
```

Page 5

```
 1     VIDEOTAPED DEPOSITION OF SUSAN ELIZABETH MORELAND
 2  was taken on December 17, 2013, commencing at 8:55 a.m.,
 3  at the offices of Arizona Reporting Service, 2200 North
 4  Central Avenue, Suite 502, Phoenix, Arizona, before Meri
 5  Coash, a Certified Reporter in the State of Arizona.
 6
 7
 8                    *   *   *
 9  APPEARANCES:
10     For the Plaintiff:
          CADDELL & CHAPMAN
11        By:  Craig C. Marchiando, Esq.
          1331 Lamar
12        Suite 1070
          Houston, Texas  77010
13        713-751-0400
          ccm@caddellchapman.com
14
       For the Defendant:
15        FARUKI IRELAND & COX, PLL
          By:  Ronald I. Raether, Jr., Esq.
16        500 Courthouse Plaza, S.W.
          10 North Ludlow Street
17        Dayton, Ohio  45402
          937-227-3733
18        rraether@ficlaw.com
19     Also present:  Jon Baugues, videographer
```

Page 58

1   A.  No.
2   Q.  So what happened on the day of the appointment?
3   A.  We took a tour of the house, loved it.  And Raul
4   Ramos handed us the -- the lease and -- the application
5   for the lease, and we took that home with us.
6   Q.  Ms. Moreland, we've -- I -- I took Mr. Haining's
7   deposition previously.  And during that deposition, we
8   marked as exhibits a number of documents.  For the purpose
9   of your deposition, I'm not going to re-mark those
10  documents or put another exhibit sticker.  Instead we've
11  agreed to continue where we left off in terms of numbering
12  the documents, which is why your petition was marked 11 --
13  A.  Okay.
14  Q.  -- instead of 1.
15  A.  Uh-huh, yes.
16  Q.  So for the record, I'll be referring to Exhibit 1
17  or Exhibit 2.  They have been previously marked in the
18  Haining deposition.  We're going to continue those same
19  designations for this deposition.
20  A.  Okay.
21  Q.  So I'm handing you what's been marked as
22  Exhibit 1.  I'm going to ask you if you've seen Exhibit 1
23  before today?
24  A.  Yes.
25  Q.  What is Exhibit 1?

Page 59

1   A.  It's the application for renting the house.
2   Q.  So is Exhibit 1 the application that Mr. Ramos
3   handed to you on the date that you and Mr. Haining had an
4   appointment to view the property?
5   A.  Yes.
6   Q.  So Mr. Ramos handed you what has been marked as
7   Exhibit 1 for this deposition.  And did you take that
8   home?
9   A.  Yes.
10  Q.  If you need to refer to it, I'll --
11  A.  That's okay.
12  Q.  And so did you fill out the application?
13  A.  Mr. Haining filled out the application.
14  Q.  And just as a point to clarify the record, if you
15  could look at Exhibit 1.  And at the very top it says "808
16  Loma Alta Terrace, Vista, California 92083"?
17  A.  Yes.
18  Q.  Is that the property that you rented from
19  Mr. Ramos?
20  A.  Yes, it is.
21  Q.  So in your previous testimony, when I've been
22  referring to the Ramos house or the Ramos property, that's
23  the 808 Loma Alta --
24  A.  Yes, it is.
25  Q.  -- residence?

Page 60

1   A.  Yes.
2   Q.  So I'm going to refer to it going forward as the
3   808 Loma Alta residence.  Is that okay?
4   A.  Yes.
5   Q.  You'll know I'm talking about the house you
6   rented from Mr. Ramos?
7   A.  Yes.
8   Q.  So Mr. Haining filled out the application for
9   808 Loma Alta residence?
10  A.  Yes.
11  Q.  Did you provide Mr. Haining any information used
12  in the application?
13  A.  I don't believe so.
14  Q.  Did you review -- review the application before
15  it was submitted to Mr. Ramos?
16  A.  Yes.
17  Q.  Let me hand you what has been marked as
18  Exhibit 2.
19      Ms. Moreland, if you'll look down at the
20  bottom right corner, there's a series of numbers.  The
21  first page of Exhibit 2 says RAMOS 1.  Do you see that?
22  A.  Yes.
23  Q.  So as we go through your testimony, I may refer
24  to RAMOS and then a number.  What I'm referring to is the
25  number in the lower right-hand corner.

Page 61

1   A.  Yes.
2   Q.  So look at Exhibit 2.  And my question is, is
3   that your application to rent the 808 Loma Alta residence,
4   filled out by Mr. Haining?
5   A.  Yes.
6   Q.  If you look at RAMOS 10 of Exhibit 2, there's a
7   signature there.  Is that your signature?
8   A.  Yes.
9   Q.  And it's dated April 2nd, 2012.  Is that the date
10  that you signed --
11  A.  Yes.
12  Q.  You've got to let me finish.
13  A.  I'm sorry.
14  Q.  That's okay.  I'll start over.
15      So if you look at RAMOS 10 in Exhibit 2,
16  there's a signature there.  Is that your signature?
17  A.  Yes.
18  Q.  And it's dated April 2nd, 2012.  Is that the date
19  that you signed RAMOS 10?
20  A.  Yes.
21  Q.  And it says in there that the statements are true
22  and correct?
23  A.  Yes.
24  Q.  Did you have a chance to review the application
25  before you signed it?

Page 62

1    A.  Yes.
2    Q.  And did you review it?
3    A.  Yes.
4    Q.  If you look at RAMOS 1 and RAMOS 2 -- Actually,
5    strike that.
6          Because if you look at RAMOS 6 and RAMOS 7
7    of Exhibit 2, your initials are at the bottom of both of
8    those pages, correct?
9    A.  Yes.
10   Q.  Did you review these two documents?  Strike that.
11         Did you review these two pages in the --
12   A.  Yes.
13   Q.  And did you look at the financial terms included
14   in both?
15   A.  Yes.
16   Q.  Did you discuss those with anyone?
17   A.  John Haining.
18   Q.  Who was primarily responsible for the residence
19   agreement and negotiating the financial conditions for
20   renting the 808 Loma Alta residence?
21   A.  John Haining.
22   Q.  Did you have any involvement in that?
23   A.  No.
24   Q.  If you look at RAMOS -- Strike that.
25         What's your relationship with Mr. Haining?

Page 63

1    A.  He is my boyfriend.
2    Q.  Have you ever been engaged?
3    A.  To him?
4    Q.  Yes, ma'am.
5    A.  No.
6    Q.  If you look at RAMOS 8 of Exhibit 2 --
7    A.  Uh-huh, yes.
8    Q.  -- under General Information, where it says
9    "Other Occupants," number 1, relationship, fiancée --
10   A.  Yes.
11   Q.  -- was that true?
12         MR. MARCHIANDO:  Objection.  Vague.
13         THE WITNESS:  It was convenient to say
14   fiancée than -- it just sounded better than
15   girlfriend/boyfriend.
16   BY MR. RAETHER:
17   Q.  Mr. Haining had not asked you to marry him, had
18   he?
19   A.  No.
20   Q.  So it was not true to characterize your
21   relationship as fiancée?
22         MR. MARCHIANDO:  Objection.  Form.
23         THE WITNESS:  He refers to me as his fiancée
24   in many situations.
25

Page 64

1    BY MR. RAETHER:
2    Q.  Where it's convenient?
3    A.  Yes.
4    Q.  If you look at RAMOS 8 in Exhibit 2, I don't see
5    a reference to the campus monitor job.
6          MR. MARCHIANDO:  We're still on page 8?
7          THE WITNESS:  Oh.  No.
8    BY MR. RAETHER:
9    Q.  Is there a reason why you didn't include the
10   campus monitor job --
11   A.  Because.
12   Q.  -- in this application?
13   A.  Because it was brief and it was a two-hour-a-day
14   job, so I didn't feel it was necessary to put that down.
15   Q.  And then the prior occupation, there's no time
16   frame as to that employment in your application, is there?
17   A.  No.
18   Q.  Do you think that if you had applied on your
19   own -- in other words, without Mr. Haining -- that
20   Mr. Ramos would have rented to you the 808 Loma -- Loma
21   property?
22         MR. MARCHIANDO:  Objection.  Form.
23         THE WITNESS:  No.
24   BY MR. RAETHER:
25   Q.  Would you have applied for that property if

Page 65

1    Mr. Haining had not applied with you?
2    A.  No.
3    Q.  Why not?
4    A.  Because I couldn't afford it.
5    Q.  Who is Darlene Luxton?
6    A.  Ex-coworker.
7    Q.  If you look at RAMOS 9 in Exhibit 2, you
8    identified her as a reference?
9    A.  Yes.
10   Q.  Why?
11   A.  I have known her now for 15 years.
12   Q.  This is in the interior design --
13   A.  Yes.
14   Q.  -- field?
15   A.  Yes.  We worked together at Encinitas Tile.
16   Q.  So really since you moved back from Mexico you've
17   known her?
18   A.  Yes.
19   Q.  Who is Sandy Meschoulam?
20   A.  Very close, dear friend.  And I worked for her
21   briefly at Montessori school.
22   Q.  Is this the campus monitor position?
23   A.  No.  No.
24   Q.  I don't remember you testifying about the
25   Montessori school.  When did you work at the Montessori

Page 82

1  BY MR. RAETHER:
2  Q. If you look at the -- at RAMOS 50, there's a
3  message from Mr. Ramos, part of that chain that you were
4  copied on, dated April 4th, 2012 at 6:45 p.m.?
5  A. Uh-huh.
6  Q. You see in the second paragraph where it says,
7  "I've come to the conclusion that you qualify to rent our
8  house"?
9  A. Yes.
10 Q. Could it be that you were approved two days after
11 your application on April 4th?
12 A. Yes.
13 Q. If you look at the message on RAMOS 49 to
14 RAMOS 50, that you were cc'd on --
15 A. Yes.
16 Q. -- it says, "I've also included a copy of your
17 credit and background checks, as you and Susan requested."
18 Do you see that?
19 A. Yes.
20 Q. Had you spoken with Mr. Ramos, before this email,
21 to request a copy of your background and credit check?
22 A. Me in person, no. John requested them.
23 Q. Do you -- Strike that.
24    So -- Strike that.
25    Did you ever speak with Mr. Ramos about your

Page 83

1  background report?
2  A. Yes.
3  Q. When?
4  A. After I read it. It was a few days after. He
5  come by the house, because John and I were painting
6  inside. He would like -- you know, he wanted to come by
7  and take a look at it. I made a statement to Raul. I
8  thanked him for doing the background check, that I'd never
9  seen anything like that, and apologizing to him for all
10 the misrepresentation on the background check.
11 Q. So you raised it with Mr. Ramos?
12 A. Yes.
13 Q. He had not mentioned the background check to you
14 before then?
15 A. He had said something to John, that it didn't
16 look good. My background check did not look good.
17    MR. RAETHER: Strike that as nonresponsive.
18 BY MR. RAETHER:
19 Q. My question was, did Mr. Ramos say anything to
20 you?
21 A. Personally?
22 Q. Yes.
23 A. No.
24 Q. After you apologized to Mr. Ramos, did you say
25 anything else to him?

Page 84

1     MR. MARCHIANDO: Objection.
2  Mischaracterizes testimony.
3     THE WITNESS: The day that we were leaving
4  the house, yes, I did.
5  BY MR. RAETHER:
6  Q. So this is when you decided to move out of the
7  808 Loma property?
8  A. Yes.
9  Q. And you remember when that was?
10 A. It was March of 2013.
11 Q. And what did you say to Mr. Ramos?
12 A. I thanked him again, and I told him that I was
13 looking into my background check and trying to clear it
14 up.
15 Q. Between the first time that you spoke to
16 Mr. Ramos and then right before you moved out in March of
17 2013, had you spoken to him about the background check in
18 that period of time?
19 A. No.
20 Q. Have you spoken to him since you moved out?
21 A. No.
22 Q. Did you ever ask Mr. Ramos for contact
23 information for CoreLogic?
24 A. No.
25 Q. Did you ever ask Mr. Ramos for contact

Page 85

1  information for SafeRent?
2  A. No.
3  Q. Did you ever ask Mr. Ramos for contact
4  information for Credco?
5  A. No.
6  Q. Why not?
7  A. I believe there was information on the background
8  check paperwork itself.
9  Q. Ms. Moreland, I'm going to hand you what we've
10 marked previously as Exhibit -- I'm going to hand both --
11 both Exhibit 7 and Exhibit 8 to you.
12 A. Okay.
13 Q. If you could look at Exhibit 8 first.
14 A. Okay.
15 Q. Have you seen Exhibit 8 before today?
16 A. Yes.
17 Q. And you notice there's a lot of black bars --
18 A. Yes.
19 Q. -- on Exhibit 8?
20 A. Uh-huh.
21 Q. So when you saw -- what -- what is Exhibit 8?
22 A. This is CoreLogic credit report.
23 Q. And if you see up there, it says "CoreLogic
24 Credco," and then it says "Credco Instant Merge Credit
25 Report." Do you see that?

Susan Elizabeth Moreland — December 17, 2013

Page 98

1 today?
2 A. Yes.
3 Q. And what did you understand it to mean?
4     MR. MARCHIANDO: Objection. Calls for a
5 legal conclusion.
6 BY MR. RAETHER:
7 Q. I'm asking for your understanding.
8     MR. MARCHIANDO: Same objection.
9     THE WITNESS: That -- Well, this
10 information has to be used to -- to verify where I lived.
11 BY MR. RAETHER:
12 Q. And "shall not be used directly for the purpose
13 of making employment and housing decisions" --
14     MR. MARCHIANDO: Same --
15 BY MR. RAETHER:
16 Q. -- right?
17     MR. MARCHIANDO: -- objection.
18     THE WITNESS: That's what it says.
19 BY MR. RAETHER:
20 Q. And Mr. Ramos rented the 808 Loma property to
21 you, right?
22 A. Yes.
23     (Deposition Exhibit 12 was marked for
24     identification.)
25

Page 99

1 BY MR. RAETHER:
2 Q. Ms. Moreland, I'm going to hand to you what has
3 been marked as Exhibit 12, which is MORELAND 1 through
4 MORELAND 9. Have you seen Exhibit 12 before today?
5 A. Yes.
6 Q. And there's some handwriting on Exhibit 12,
7 starts on Moreland 3, some squiggly lines.
8 A. Yes.
9 Q. But more predominantly on MORELAND 6 through
10 MORELAND 9. Whose -- Have you seen that handwriting
11 before?
12 A. Yes.
13 Q. Is that your handwriting?
14 A. Yes.
15 Q. So other than the handwritten notations, is
16 Exhibit 12 -- Strike that.
17     Except for the handwritten notations and the
18 redacted portions -- in other words, the portions that
19 have black markings --
20 A. Uh-huh, yes.
21 Q. -- is Exhibit 12 the same as Exhibit 10?
22 A. Exhibit 10 --
23     MR. MARCHIANDO: Exhibit 10 is the previous
24 document.
25     THE WITNESS: Oh.

Page 100

1     MR. MARCHIANDO: Objection. The documents
2 speak for themselves.
3     THE WITNESS: Yes.
4 BY MR. RAETHER:
5 Q. So is Exhibit 12 the document you received from
6 Mr. Ramos?
7 A. Yes.
8 Q. If you look at MORELAND 3 of Exhibit 12 --
9 A. Yes.
10 Q. -- there's an underline underneath the phone
11 number. Do you see that?
12 A. Yes.
13 Q. Did you do that?
14 A. Yes.
15 Q. Why?
16 A. Don't remember.
17 Q. Earlier you testified that page 14 of 21 was
18 accurate?
19 A. Yes.
20 Q. And so this underlining had nothing to do with
21 noting an inaccuracy or --
22 A. No.
23 Q. MORELAND 5 of Exhibit 12. We're on Exhibit 12.
24 A. Just checking.
25     Yes.

Page 101

1 Q. No handwritten notations on MORELAND 5?
2 A. No.
3 Q. MORELAND 6, record 5 of 29, there's an asterisk
4 circled?
5 A. Yes.
6 Q. Do you remember why you put an asterisk there and
7 circled it?
8 A. Don't remember.
9 Q. Do you remember when you made the notation for
10 record 5 on MORELAND 6?
11 A. Yes. It was about three weeks after we moved
12 into the house, May, first week in May.
13 Q. So May 2012?
14 A. Yes.
15 Q. Any reason why you picked the report back up in
16 May of 2012?
17 A. Several reasons. I was looking for a job. I was
18 very busy with the new house. And then I got somewhat
19 sick. When I felt a little better, I went back to the
20 process of this.
21     Meanwhile, I was on the computer
22 retaining -- trying to get information for -- for several
23 different things.
24 Q. What different things?
25 A. I was trying to get information on how you look

26 (Pages 98 to 101)

Susan Elizabeth Moreland                              December 17, 2013

Page 102

1  into your background, check with different agencies, how
2  to get to certain agencies to get information.
3     Q.  Can you remember what you -- So you were looking
4  on the Internet for information?
5     A.  Yes.
6     Q.  Do you remember which websites you looked at?
7     A.  I went to CoreLogic. I don't remember all of the
8  different websites. I was just trying to gain information
9  on how you go about fixing a bad credit report or
10 background check.
11    Q.  Do you remember what you saw on the CoreLogic
12 website?
13    A.  Really, not too much. You would have to -- I do
14 remember you have to answer a question, then they would
15 put you through to another page. You'd answer another
16 question regarding your issues, and just kept moving you
17 from one page to the next page.
18         I was looking for phone numbers, addresses.
19 And I believe I did find an address.
20    Q.  Were you able to find any phone numbers?
21    A.  No.
22    Q.  But you did find an address?
23    A.  I did find an address.
24    Q.  Do you remember -- So you went through the
25 CoreLogic website and could not find any phone numbers?

Page 103

1     A.  None. No. Not that I remember.
2     Q.  But you found an address. Do you remember what
3  the address was?
4     A.  I don't have it. I thought it was on --
5  written -- I didn't see it on here. I must have -- I
6  don't have it anymore.
7     Q.  So "on here" you're referring to Exhibit 12?
8     A.  Yes.
9     Q.  So at some point, you wrote down the address?
10    A.  I believe so. Normally, I'd put it on a sticky
11 note and stick it on there, but it's gone now.
12    Q.  Did you ever send any correspondence to that
13 address?
14    A.  Yes, I did.
15    Q.  How many times?
16    A.  Total, four.
17    Q.  When was the first time?
18    A.  It was around April -- March, April -- I believe
19 it was the end of April. I don't have an exact date. It
20 was when -- I wrote a letter when I finally found the
21 address.
22         And as you can see, that's why all of this
23 has -- these pages have been marked and -- with all my
24 noteings and everything else. Those that are wrong, I put
25 them in an envelope with the letter, sent it to them

Page 104

1  requesting that they help me figure out how to fix this.
2  It's a problem.
3     Q.  Did you keep a copy of that letter?
4     A.  I don't have it, no.
5     Q.  Do you have a copy of the marked-up report, which
6  is Exhibit 12?
7     A.  Yes.
8     Q.  But not the letter?
9     A.  No.
10    Q.  Anybody help you prepare that letter?
11    A.  No.
12    Q.  Did you review that letter with anyone before you
13 sent it?
14    A.  No.
15    Q.  Did you show the April letter to anyone before
16 you sent it?
17    A.  No.
18    Q.  And you cannot remember what address you sent it
19 to?
20    A.  I do not remember.
21    Q.  So you think that was April 2012?
22    A.  Yes.
23    Q.  Earlier you testified that you marked up
24 Exhibit 12 in May of 2012?
25    A.  Uh-huh.

Page 105

1     Q.  Yes?
2     A.  Yes.
3     Q.  I'm trying to reconcile the difference --
4  discrepancy between sending the letter with the marked-up
5  report and the time when you testified that you marked up
6  the report.
7     A.  I don't clearly remember exact dates.
8     Q.  Did you ever get a response to your -- we'll call
9  it the April letter?
10    A.  No.
11    Q.  So you sent another correspondence?
12    A.  Yes. On the -- I believe on the -- the website.
13 Like I said, to get into the website, you had to go
14 through what your issues were, what your problems are, and
15 I finally got to a page, of several times trying to get in
16 there, to the website, that I actually filled out a form.
17 And within the -- you know, the correspondence of sending
18 it to them through the computer.
19    Q.  So this is something you --
20    A.  To their email address.
21    Q.  I'm sorry.
22    A.  Okay.
23    Q.  This is something you could electronically
24 submit?
25    A.  Yes.

27 (Pages 102 to 105)

Susan Elizabeth Moreland                                    December 17, 2013

Page 122
1    Q.  Did he prescribe you any medication?
2    A.  Yes, he did.
3    Q.  What did he prescribe?
4    A.  The same medication that I'm taking now.
5    Q.  And what is that?
6    A.  Do I have to give that out?  I mean, is it --
7    Q.  I'd like to know what medication you're on.
8    A.  Okay.  It's -- it's G-a-b- -- G-a-b- -- I'm
9  trying to see if the -- the name's on here.
10           No, I don't.  It's -- it's hard to pronounce
11  it.  G-a-b-i-n-t-i-n-a, Gab- -- yeah, Gabintin.  Gabitin,
12  G-a-b- --
13   Q.  Is your claim that your frus- -- is your -- is
14  your claim that -- in this case, do you claim that as part
15  of your damages that you seek from CoreLogic is your
16  diagnosis of having trigeminal neurology?
17           MR. MARCHIANDO:  Object to form.
18           THE WITNESS:  That's -- that's not where
19  this started out, no.
20  BY MR. RAETHER:
21   Q.  So as part of your claim against CoreLogic for
22  actual damages, does it relate to your diagnosis of
23  trigeminal neurology?
24           MR. MARCHIANDO:  Same objection.
25           THE WITNESS:  I don't know at this time.

Page 123
1  BY MR. RAETHER:
2    Q.  Why not?
3    A.  Because it was never a thought.
4          My first thought is, when I started all
5  this, that my background check, everything, would be taken
6  care of.  That's all I want was just this mess cleaned up.
7    Q.  We talked about the letter that you sent in
8  April-May 2012 and then the email?
9    A.  Yes.
10   Q.  And you mentioned there were two other --
11   A.  Yes.
12   Q.  -- correspondence --
13   A.  Yes.
14   Q.  -- attempts with CoreLogic.  What was the third
15  one?
16   A.  It was paperwork that I filled out, that you can
17  retrieve from the Internet.  But I couldn't find it, so my
18  lawyers found it for me.  So I filled it all out.  I
19  copied my driver's license, sent them a copy of, I
20  believe, other identifications.  I had to take it to the
21  post office -- well, first, I copied it all.  Then went to
22  the post office, had it registered, paid for that, and
23  mailed it to them.  And never got -- how you're supposed
24  to receive a receipt back in the mail, I never received --
25  I never got any communications with them returned.

Page 124
1    Q.  So you never received the returned receipt from
2  the post --
3    A.  No, never did.
4    Q.  -- postal office?
5    A.  No.
6    Q.  Did you inquire as to why?
7    A.  Yeah.  You -- you can get online and you check
8  and it just -- there was nothing there.  It was delivered.
9  It says it was delivered.
10   Q.  Did you make a copy -- so you said you made a
11  copy of the paperwork?
12   A.  Yes.
13   Q.  Did you keep a copy of that?
14   A.  No, I did not.
15   Q.  Do you remember when you --
16   A.  That was an accident.  My -- what do you say --
17  my -- my copy machine at home had ran out of ink.  So
18  basically I just put it in envelopes and sent them out.
19   Q.  So you did not make a copy?
20   A.  I did not, no.
21   Q.  Did you keep a copy of your receipt from the
22  postal office?
23   A.  Yes.
24   Q.  Do you still have that?
25   A.  Yes.

Page 125
1           MR. RAETHER:  Has that been produced, Craig?
2  I don't -- I haven't seen that.
3           MR. MARCHIANDO:  No.
4           THE WITNESS:  Yes.
5           MR. MARCHIANDO:  Receipt from the post
6  office?
7           THE WITNESS:  Yeah.  Sorry.
8           MR. RAETHER:  Maybe at a break you can go
9  back and see if you can find that for me.
10          THE WITNESS:  We emailed it to you, scanned
11  it.
12  BY MR. RAETHER:
13   Q.  You said you went online to check on the delivery
14  of the package?
15   A.  Yes.
16   Q.  Did you take a print of that screen?  Did you
17  print it out?
18   A.  I don't believe I did.
19   Q.  Did you send the paperwork to anyone else besides
20  CoreLogic?
21   A.  Yes.
22   Q.  Who?
23   A.  Francis.
24   Q.  You sent a copy to Francis & Mailman?
25   A.  Yes.

32 (Pages 122 to 125)

Coash and Coash, Inc.                    602-258-1440

Exhibit 1 Page 13

Page 150
1    A.   I don't remember.
2    Q.   Did you receive any documentation from the IRS or
3    the Social Security Administration?
4    A.   No.
5    Q.   Back to Exhibit 12.
6    A.   Yes.
7    Q.   So MORELAND 9, record 23 through 26, to the
8    right, has the -- has a notation "No. Lived in Mex"?
9    A.   Yeah, Mexico.
10   Q.   What did you mean by that?
11   A.   Well, I was living in Mexico when all of this
12   occurred -- most of it, anyhow. I don't remem- -- yeah,
13   '92. Yeah. Yep. '86. Okay.
14   Q.   I had, from the prior testimony, you said that
15   you moved to Mexico in 1993.
16   A.   I think that might be wrong. I believe it was
17   '90.
18   Q.   '90?
19   A.   Yes, 1990. I lived there 10 years. We came back
20   in 2000. So 10 years, yeah.
21   Q.   So now you think you lived in Mexico from 1990 to
22   2000?
23   A.   Yes.
24   Q.   So your prior testimony that you lived there from
25   1993 to 2003, is that wrong?

Page 151
1    A.   Yes.
2    Q.   And the Baccharis address, before you testified
3    you lived there for two years?
4    A.   Uh-huh. Yes.
5    Q.   Is that still true?
6    A.   Yes.
7    Q.   You only lived there two years?
8    A.   Yes.
9    Q.   So you moved out in 2002?
10   A.   Yes.
11   Q.   If you look, 26 of 29, right there it says
12   "A-R-O-N" and then "N-O-V-A-C-K" and then the numbers
13   215-735-8600. Do you see that?
14   A.   Yes.
15   Q.   What does that relate to?
16   A.   I don't -- Aron Novack -- that might be from
17   maybe one of the previous phone calls that I made. I
18   don't -- I don't know what it's related to exactly.
19   Q.   Do you remember talking to an Aron Novack?
20   A.   I don't remember.
21   Q.   And you have no recollection today of Aron
22   Novack?
23   A.   None.
24   Q.   If you look at 27 of 29, it says asterisk SSN and
25   then the number sign, no, did not live there --

Page 152
1    A.   Did not live there.
2    Q.   -- divorced?
3    A.   Yes.
4    Q.   Did I read that correctly?
5    A.   Yes.
6    Q.   What did you mean by that?
7    A.   Harry Mortenson.
8    Q.   That's your former husband?
9    A.   Yes. And I believe that I was divorced at that
10   time. So this P.O. box -- I mean -- did not belong to me.
11   Q.   Do you know why you wrote "SSN#"?
12   A.   No, I do not.
13   Q.   And likewise, for 28 of 29, you wrote "SSN#"?
14   A.   Yes, I do remember. I thought, when I read this,
15   that Harry Mortenson was using my social security.
16   Q.   Did you find out whether he had been?
17   A.   No, I did not.
18        (Deposition Exhibit 14 was marked for
19        identification.)
20   BY MR. RAETHER:
21   Q.   Ms. Moreland, I'm going to hand to you a document
22   that's been marked as Exhibit 14, which is a document from
23   my client CoreLogic SafeRent.
24   A.   Thank you. Yes.
25   Q.   Have you seen Exhibit 14 before today?

Page 153
1    A.   Yes.
2    Q.   And it's dated October 19, 2012. Do you see
3    that? Page -- the first page of Exhibit 14.
4    A.   Yes.
5    Q.   And there's a signature on Exhibit 14. Is that
6    your signature?
7    A.   Yes.
8    Q.   Do you remember preparing the letter which is
9    Exhibit 14?
10   A.   Yes.
11   Q.   And it says -- it's addressed to CoreLogic
12   SafeRent, 12395 First American Way, Poway, California
13   92064.
14   A.   Yes.
15   Q.   Do you see that?
16   A.   Yes.
17   Q.   Do you know where you got that address from?
18   A.   Yes.
19   Q.   Where?
20   A.   Mailman, my attorneys.
21   Q.   Don't -- don't even say anything else.
22        So from Francis & Mailman?
23   A.   Yes.
24   Q.   Did you write the letter which is Exhibit 14?
25   A.   No.

Page 154

1  Q. Who wrote the letter?
2  A. Francis & Mailman.
3  Q. So they sent you this letter and asked you to
4  send it?
5  A. Yes.
6  Q. You already had a copy of your report that
7  Mr. Ramos provided to you, right?
8  A. Yes.
9  Q. And initially, what you wanted was to correct the
10 information in that report, right?
11 A. Yes.
12 Q. Why, in October of 2012, were you asking for a
13 copy of your report?
14       MR. MARCHIANDO: Objection. I'll instruct
15 you not to answer if it will reveal attorney-client
16 communications.
17       THE WITNESS: Sorry.
18 BY MR. RAETHER:
19 Q. So you did it at the instruction of your
20 attorney?
21 A. Yes.
22 Q. And you don't have any personal opinion as to
23 why?
24 A. Yes, I do.
25 Q. Why?

Page 155

1       MR. MARCHIANDO: The same objection. If you
2  can't answer without revealing attorney-client
3  communications, don't answer.
4  BY MR. RAETHER:
5  Q. So Exhibit 14 you sent at the direction of your
6  attorneys?
7  A. Yes.
8  Q. Asking for the information that your attorneys
9  wanted you to ask for?
10 A. Yes.
11 Q. All that SafeRent CoreLogic has in its file are
12 the two pages that are Exhibit 14. Do you remember
13 sending Exhibit 14?
14 A. Yes.
15 Q. Was there anything else in Exhibit 14?
16 A. Yes.
17 Q. What?
18 A. Information that -- I believe it was regarding
19 the background check.
20 Q. What information regarding -- what
21 specifically -- what background check?
22 A. The one from CoreLogic SafeRent, the -- yeah, the
23 background check, this one. The one that I'm trying to
24 fix.
25 Q. Earlier you testified that you sent that in April

Page 156

1  or May 2012, and this letter is dated October 19th. And
2  in your prior testimony, you didn't mention an
3  October 19th letter, right?
4  A. Exactly. But I was talking about my personal
5  letter that I sent in, plus my emails that I sent.
6  Q. Did you provide a copy to your attorneys of what
7  you sent to CoreLogic on October 19th, which is
8  Exhibit 14?
9  A. I don't remember.
10 Q. Did you keep a copy?
11 A. I do not have a copy.
12 Q. You don't remember if you sent a copy to your
13 attorneys Francis & Mailman?
14 A. I might have.
15       MR. RAETHER: We -- Craig, we haven't --
16       THE WITNESS: I don't remember.
17       MR. RAETHER: -- gotten this letter or,
18 frankly, any of the other correspondence that your client
19 allegedly sent to CoreLogic SafeRent.
20 BY MR. RAETHER:
21 Q. Earlier I asked you if you ever remember getting
22 any responses from CoreLogic SafeRent. And I think your
23 testimony was no?
24 A. Correct.
25       (Deposition Exhibit 15 was marked for

Page 157

1       identification.)
2  BY MR. RAETHER:
3  Q. I'm going to hand you what's been marked as
4  Exhibit 15, which is a document that CoreLogic SafeRent
5  provided to me. It's a document dated January 16th, 2013.
6  And it's addressed to Susan Moreland, 808 Loma Alta
7  Terrace, Vista, California 92083.
8  A. Uh-huh.
9  Q. Is that --
10 A. Yes.
11 Q. Yes?
12 A. Yes.
13 Q. Is that where you were living on January 16th?
14 A. Yes.
15 Q. But you don't remember getting Exhibit 15 in the
16 mail?
17 A. No.
18 Q. Any reason -- Did you have any issues with
19 getting mail when you lived in Loma Alta?
20 A. Yes.
21 Q. What -- what issues did you have with getting
22 mail?
23 A. I don't remember specifically. I do remember --
24 I know Mr. Haining had issues with mail. Because of when
25 I filed online to change our address to Loma -- 808 Loma

Page 186

1  A. In -- let's see. Every couple of years I would
2  have one or two, so probably 15, 20.
3  Q. So you had one in sometime the summer of 2012?
4  A. Yes.
5  Q. When was the prior episode?
6  A. I never know. It -- it's a very strange thing.
7  I can have them. I'm not actually knowing that I'm having
8  it. It could be -- it could be anything. I get major
9  numbness and pains and -- so sometimes I just relate it to
10 whatever I'm doing. But a lot what I'm told, the doctor
11 says sometimes you just don't know.
12 Q. You don't -- you just don't know what?
13 A. That I'm having an attack. If I think, you know,
14 maybe I picked something up wrong or I do something, I
15 don't know if it is an attack or if it's just something
16 that I was doing to hurt, you know, my arm, my back, my
17 leg.
18 Q. For the numbness or the pain, you can't tell if
19 that's MS related or something else?
20 A. Right.
21 Q. When was your last episode just before the summer
22 of 2012?
23 A. Before 2000 -- I'm sorry. Repeat that question.
24 Q. You testified that over the last 30 years you've
25 had 15 to 20 episodes.

Page 187

1  A. Yes.
2  Q. And I'm trying to get a sense as to -- you
3  testified earlier that you had one in the summer of 2012?
4  A. Yes. That's the trigeminal.
5  Q. Trigeminal.
6  A. Right.
7  Q. When was the last episode you had just before
8  that?
9  A. Before that? I don't know. I really don't know.
10 Q. And have you had one since summer of 2012?
11 A. Yes. Yes.
12 Q. When was that?
13 A. Just a few months ago. I don't know the exact
14 date.
15 Q. Did you go to treat- -- for treatment?
16 A. Yes.
17 Q. Is that when you had the MRI?
18 A. Yes.
19 Q. You also testified that you incurred
20 out-of-pocket expenses?
21 A. Yes.
22 Q. And that's related to this lawsuit?
23 A. Yes.
24 Q. You said you drove all over the place. Did I get
25 that right?

Page 188

1  A. Yes.
2     MR. MARCHIANDO: Object. Asked and
3  answered.
4  BY MR. RAETHER:
5  Q. Where did you drive to?
6  A. I had to drive to -- what was it -- FedEx, and
7  then I drove to the UPS Stores -- yeah.
8  Q. Why did you drive to the FedEx?
9  A. Because I thought they would be able to do what I
10 needed to do, that was to give me the receipt. Because I
11 wanted -- that's when I went to the post office. And so I
12 decided to get it from the post office instead.
13 Q. This is in reference to your earlier testimony
14 about sending a communication to CoreLogic SafeRent?
15 A. Yes.
16 Q. And you think you went to FedEx to ask for a
17 receipt?
18 A. I was looking for an envelope and a special
19 receipt, and they couldn't accommodate me. So then I had
20 to drive to the post office.
21 Q. I see. So you went to FedEx first and they
22 couldn't accommodate you --
23 A. Yes.
24 Q. -- so you went to the post office?
25 A. Yes.

Page 189

1  Q. And how long did that take you?
2  A. Post office was pretty far away from the house,
3  so probably a good 2-hour roundtrip.
4  Q. Did you drive?
5  A. Yes, I did.
6  Q. Did you drive Mr. Haining's car?
7  A. Yes.
8  Q. Did you reimburse him for gas?
9  A. No.
10 Q. Did you pay Mr. Haining any money for use of his
11 car?
12 A. No.
13 Q. The UPS, you testified that you went there. What
14 was that for?
15 A. To get the registered mail.
16 Q. So the same --
17 A. Yes.
18 Q. -- attempt with FedEx?
19 A. Yes.
20 Q. Is this the same trip or a separate trip?
21 A. Same trip.
22 Q. So the two hours was to go to FedEx, UPS, and
23 then the post office?
24 A. Uh-huh.
25 Q. Yes?

Page 190

1  A. Yes.
2  Q. You also -- you also testified about mailing
3  expenses?
4  A. Yes.
5  Q. Do you have receipts for those mailing expenses?
6  A. Yes.
7     MR. RAETHER: I'd ask that those be
8  produced. I haven't seen them.
9  BY MR. RAETHER:
10 Q. How many receipts?
11 A. Two.
12 Q. What were they for?
13 A. One was for -- let's see, I believe copies,
14 stamps, and then the mail receipt, the registered mail
15 receipt.
16 Q. Do you have one receipt for the copies and stamps
17 and one receipt for the certified return mail?
18 A. I have two receipts. One, I believe -- yes.
19 Yes.
20 Q. Do you know the total amount?
21 A. Not -- not offhand, no.
22 Q. Less than $20?
23 A. Yes.
24 Q. You also mentioned no health insurance. Did you
25 have health insurance in 2012?

Page 191

1  A. No.
2  Q. When was the last time you had health insurance?
3  A. 2005, I believe.
4  Q. Did you get government assistance?
5     MR. MARCHIANDO: Objection. Vague.
6  BY MR. RAETHER:
7  Q. Do you get government assistance as to your
8  health-care expenses?
9  A. No.
10 Q. Do you get government -- any other government
11 expenses -- do you get any other government assistance?
12 A. Presently, no.
13 Q. Previously you got some unemployment?
14 A. Yes.
15 Q. Have you ever been on Medicaid?
16 A. No.
17 Q. Have you signed up for the new healthcare under
18 Obama?
19 A. Yes, I have.
20 Q. When did you sign up for that?
21 A. I mailed that in just on the 7th of -- 7th of
22 this month.
23 Q. Is it your understanding you'll have health care
24 beginning the first of the year?
25 A. Yes.

Page 192

1  Q. Have you been unable to afford healthcare
2  before --
3  A. Yes.
4  Q. -- December?
5  A. Yes.
6  Q. Have you been unable to afford healthcare before
7  this year?
8  A. Yes.
9  Q. How much have you spent on medications since
10 June 2012?
11 A. I'd say about 6- -- 6- to $700.
12 Q. Is that a prescription that you take as needed or
13 do you take it every day?
14 A. Every day.
15 Q. Have you had to pay for your doctor visits?
16 A. Yes.
17 Q. How much have you spent on that since June 2012?
18 A. June 2012? So that's one, two, three -- 275,
19 275, 275 -- so $900.
20 Q. Did you have to pay for the MRI?
21 A. No.
22 Q. Besides doctor visits and medications, have you
23 spent anything else on healthcare since June 2012?
24 A. No.
25 Q. Besides out-of-pocket -- Strike that.

Page 193

1     In terms of out-of-pocket expenses, do you
2  have anything other than driving all over the place,
3  mailing expenses, and no health insurance, medications?
4  A. No.
5  Q. In terms of the damages that you're seeking in
6  this case, anything other than a failure to obtain
7  employment or the out-of-pocket expenses you've testified
8  to here today?
9     MR. MARCHIANDO: Objection. Vague.
10    THE WITNESS: Can you rephrase that
11 question?
12 BY MR. RAETHER:
13 Q. Sure. Earlier, when your counsel was asking you
14 questions, you testified that the damages that you seek
15 are for stress and emotional, looking for employment, and
16 then the out-of-pocket expenses.
17 A. Yes.
18 Q. Is there anything else?
19 A. No.
20 Q. The stress and emotional, tell me about that.
21 What are you seek -- what are you seeking there?
22 A. Stress and emotional? I'm sorry. Can you
23 rephrase that question?
24 Q. Yeah. When your counsel was asking you questions
25 about damages, you said that you were seeking damages for

Page 194

1 stress and emotional. What did you mean by that?
2     MR. MARCHIANDO: Objection. Compound.
3     THE WITNESS: Loss of hair, really no sleep,
4 just everyday stress, headaches, depression. Just
5 everyday drama.
6 BY MR. RAETHER:
7   Q. What kind of everyday drama?
8   A. Oh, just knowing, you know, that this is out
9 there -- it's out there, people are looking at it. They
10 don't know if I'm a bum, somebody just, you know, real
11 flighty, not very grounded, it bothers. And people using
12 my name, my social security number, that's extremely
13 stressful.
14   Q. For what period of time?
15   A. The whole time since I found -- found out about
16 it.
17   Q. So even after you decided not to submit a police
18 report, the identity theft has still been bothering you?
19     MR. MARCHIANDO: Objection. Compound.
20     THE WITNESS: Yes.
21 BY MR. RAETHER:
22   Q. And you still haven't submitted a police report?
23     MR. MARCHIANDO: Objection. Vague.
24     THE WITNESS: I did not.
25

Page 195

1 BY MR. RAETHER:
2   Q. And on your application to Shockness Property
3 Group, you checked that there wasn't anything in your
4 report that you thought would be troubling?
5     MR. MARCHIANDO: Objection.
6 Mischaracterizes document.
7 BY MR. RAETHER:
8   Q. Nothing that you would expect in your credit
9 report in terms of past or current difficulties?
10     MR. MARCHIANDO: Same objection.
11     THE WITNESS: That question is misleading.
12 BY MR. RAETHER:
13   Q. Do you have any other stress in your life,
14 Ms. Moreland, besides the Sa- -- what's -- addresses and
15 names in a SafeRent IDentify Report?
16     MR. MARCHIANDO: Objection. Compound.
17     THE WITNESS: No.
18 BY MR. RAETHER:
19   Q. Financially, you guys are doing well?
20   A. We're doing okay, yes.
21     MR. RAETHER: All right. No other
22 questions. Thank you.
23     MR. MARCHIANDO: We'll reserve the rest of
24 our questions.
25     THE VIDEOGRAPHER: We are off the record.

Page 196

1 The time on the video monitor is 2:31. This concludes
2 disk three and this concludes the deposition.
3     (The deposition was concluded at 2:31 p.m.)
4
5         SUSAN ELIZABETH MORELAND

Page 197

1 STATE OF ARIZONA )
2 COUNTY OF MARICOPA )
3     BE IT KNOWN the foregoing deposition was
4 taken by me pursuant to stipulation of counsel; that I was
5 then and there a Certified Reporter of the State of
6 Arizona, and by virtue thereof authorized to administer an
7 oath; that the witness before testifying was duly sworn by
8 me to testify to the whole truth; notice was provided that
9 the transcript was available for signature by the
10 deponent; that the questions propounded by counsel and the
11 answers of the witness thereto were taken down by me in
12 shorthand and thereafter transcribed into typewriting
13 under my direction; that the foregoing pages are a full,
14 true, and accurate transcript of all proceedings and
15 testimony had and adduced upon the taking of said
16 deposition, all to the best of my skill and ability.
17   I FURTHER CERTIFY that I am in no way related to
18 nor employed by any parties hereto nor am I in any way
19 interested in the outcome hereof.
20     DATED at Phoenix, Arizona, this_____day of
21     _____, 2013.
22
23
24
25     Meri Coash, RMR, CRR
    Certified Reporter #50327