# EXHIBIT 2



# Compressed Transcript of the Testimony of
# ROBYN SMALL-CONFIDENTIAL, 2/5/14

## CONFIDENTIAL

**Case:** Moreland v. Corelogic Saferent, LLC

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Exhibit 2 Page 25

Page 1

```
IN THE UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA

SUSAN E. MORELAND,          :
         Plaintiff,  : Case No.:
    vs.                     : SACV13-00470 AG (ANx)
CORELOGIC SAFERENT, LLC,    :
         Defendant.         :
                   - - -
          CONFIDENTIAL TRANSCRIPT
                   - - -
     Oral deposition of ROBYN SMALL held at the
Law Offices of Morrison & Foerster, LLP, 1650 Tysons
Boulevard, Suite 400, McLean, Virginia 22102, on
Wednesday, February 5, 2014, commencing at 9:36 a.m.
taken by and before Janice Jones, Registered
Professional Reporter and Notary Public.

                   - - -



         SUMMIT COURT REPORTING, INC.
      Certified Court Reporters & Videographers
          1500 Walnut Street, Suite 1610
           Philadelphia, Pennsylvania 19102
     424 Fleming Pike, Hammonton, New Jersey 08037
     (215) 985-2400 * (609) 567-3315 * (800) 447-8648
                www.summitreporting.com
```

Page 2

```
 1
 2
 3   APPEARANCES:
 4
 5     Francis & Mailman, P.C.
 6     BY: JAMES A. FRANCIS, ESQUIRE
 7     AND LAUREN BRENNAN, ESQUIRE
 8     Land Title Building - 19th Floor
 9     100 South Broad Street
10     Philadelphia, PA 19110
11     (215) 735-8600
12     Email: jfrancis@consumerlawfirm.com
13            lbrennan@consumerlawfirm.com
14     REPRESENTING THE PLAINTIFF
15
16     Faruki, Ireland & Cox, PLL
17     BY: RONALD I. RAETHER, JR., ESQUIRE
18     500 COURTHOUSE PLAZA, S.W.
19     10 North Ludlow Street
20     Dayton, Ohio 45402
21     (937)-227-3733
22     Email: rraether@ficlaw.com
23     REPRESENTING THE DEFENDANT
24
25                   - - -
```

Page 3

```
 1              I N D E X
 2
 3   WITNESS                           PAGE
 4   ROBYN SMALL
 5     By Mr. Francis                    4
 6
 7                   - - -
 8
 9              E X H I B I T S
10   Number                         Marked
11   P-1    Free Form Remarks          54
12   P-2    Consumer Disclosure Instructions   121
13   P-3    Consumer Disclosure Request Form   123
14   P-4    Cover Sheet/File Disclosure         124
15   P-5    Saferent Consumer Copy Procedures   125
16   P-6    Consumer Relations Policy Manual    127
17   P-7    Cover Letter/Disclosure File Form   131
18   P-8    Cover Letter/Disclosure Request     133
19   P-9    Consumer Disclosure Instructions    135
20          Maryland State Summary of Rights
21
22
23
24
25
```

Page 4

```
 1              (It is hereby stipulated and
 2        agreed by and between counsel for the
 3        respective parties that filing, sealing,
 4        and certification are waived; and that
 5        all objections, except as to the form of
 6        the question, are reserved to the time
 7        of trial.)
 8                   - - -
 9              ROBYN SMALL, having been duly
10        sworn/affirmed, was examined as follows:
11                EXAMINATION
12                   - - -
13   BY MR. FRANCIS:
14        Q    Ma'am, good morning.  My name is Jim
15   Francis.  I'm an attorney, one of the lawyers
16   representing the plaintiff in the case called Moreland
17   versus Corelogic Saferent.
18             Today, I'm going to be taking your
19   deposition.  Would you please state and spell your full
20   name for the record?
21        A    It's Robyn Small, R-O-B-Y-N, S-M-A-L-L.
22        Q    All right.  Ms. Small, have you ever given
23   a deposition before?
24        A    I have.
25        Q    All right.  On how many different
```

Exhibit 2 Page 36

1 (Pages 1 to 4)

**Moreland v. Corelogic Saferent, LLC**  ROBYN SMALL-CONFIDENTIAL, 2/5/14

Page 21

1  request for a copy of his or her file?
2  A  No.
3  Q  Who did that?
4  A  That was in practice before I joined the
5  company and has not changed substantively in terms of
6  how we respond.
7      We have made some changes over time as the
8  volume increased to maximize the efficiency in getting
9  them out quickly to consumers.
10 Q  All right.  So are you saying that the
11 process that was followed by the company for fulfilling
12 consumer file requests has been essentially consistent
13 or the same since before you joined?
14 A  There have been changes.  The basic premise
15 of responding in accordance with the FCRA has not
16 changed.
17     How we respond, we have implemented
18 acceptance by fax, by providing file disclosures and
19 dispute results over the phone or by fax in order to be
20 able to respond more quickly and efficiently to the
21 consumers.
22 Q  All right.  Let's talk specifically about
23 file disclosures.
24     Has the process for handling file
25 disclosures changed over that time period?

Page 22

1      MR. RAETHER:  Objection to form.
2  BY MR. FRANCIS:
3  Q  You can answer.
4  A  It has -- it has not changed in that we
5  respond to the consumer within a specified time period.
6      We have increased the efficiency with which
7  we can respond by adding ways that we accept the file
8  requests or requests for disclosure.
9      We have increased the availability of
10 Consumer Disclosure Forms to the consumer by adding a
11 website, adding automated request lines, having the
12 consumer have the ability to speak with a live person
13 for assistance in filling out forms, and also being
14 able to offer alternative means of disclosure in
15 addition to a written response in the mail.
16 Q  All right.  Am I correct, based upon my
17 review of some of the documents that have been produced
18 in this case, that at least at some point, if not up
19 until the current time, the company used a standard
20 form, which appears to be coded CRD001 for consumers to
21 fill out in connection with processing a file,
22 disclosure request?
23 A  The department does have a form --
24 Q  All right.
25 A  -- that consumers can use.

Page 23

1  Q  Right.  I am just using the coding that I
2  saw on that form.
3      Do you know the form that I am talking
4  about?
5  A  Yes.  That is the correct code.
6  Q  All right.  So let me just focus on the
7  CRD001 form for a second.
8      Has that form changed in any way since you
9  have been with the company?
10 A  It has.
11 Q  All right.  Tell me about when it changed,
12 according to your recollection.
13 A  The form has been reviewed almost every
14 year, so there have been several changes throughout the
15 years including -- most of the changes are to the
16 instructions.
17     We have added a Spanish language version of
18 summary of rights and instructions; we have added the
19 ability for consumers to fax in their disclosure
20 request and added that fax number.
21     We have a third-party authorization form
22 that if the consumer wanted to have an attorney or a
23 spouse or another person who might -- translator act on
24 their behalf or receive their personal information.
25 Q  All right.  Any other changes to the form

Page 24

1  that you recall?
2  A  I think there was also a -- there have been
3  some changes because of the fact that we have changed
4  the form to specify a particular reason that a consumer
5  might be requesting file disclosure, you know, asking
6  for their annual free credit report or free consumer
7  report versus a consumer report based on an adverse
8  action request.
9      We have removed -- there was a fee
10 structure that was allowed under the FCRA but we were
11 not collecting the fee, so we took out the table that
12 had stated how much you could charge to obtain a copy
13 of your file -- or for the consumer to obtain a copy of
14 his or her file.
15 Q  Have there been any changes to the form or
16 the instructions accompanying the form in the last
17 couple of years and by that I mean since January of
18 2012, for example?
19 A  In January of 2012, the form became the
20 responsibility of our Poway office.  I'm not familiar
21 with what that form says today.
22 Q  Poway?
23 A  Poway is our California corporate office.
24 Q  Oh, all right.  How do you spell that?
25 A  It's P-O-W-A-Y.

Page 29

1  which consumers might be able to request it.
2           Correct?
3       A   That is correct.
4       Q   But one of the methods that the company
5  used to handle consumer file disclosure requests was
6  the CRD001 form.
7           Correct?
8           MR. RAETHER: Objection to form.
9  BY MR. FRANCIS:
10      Q   You can answer it.
11      A   That is correct.
12      Q   When I say 'the form,' that the form that
13 would be sent to consumers would include the
14 instructions such the requirement -- such as the
15 documentation instructions.
16          Correct?
17      A   That is correct.
18      Q   All right. Would you please tell me how
19 the company used the CRD001 form in connection with
20 fulfilling consumer file disclosure requests?
21          How was the form used?
22      A   When we receive the form, we would use that
23 form as a guide to look for matching criteria for
24 existing reports in our system that might have been run
25 by one of our clients so a matching name and social

Page 30

1  number or name and address or birth date to pull a
2  report.
3           We would also use the information that was
4  on the form to generate a new report so that when the
5  consumer received disclosure, they essentially received
6  sometimes multiple reports.
7           If there was an existing historical report
8  that had been run in the past 65, 70 days or so by one
9  of our clients, that report would be provided along
10 with a new report that was generated by myself or
11 someone on my staff using the information that the
12 consumer had completed on the form -- on the disclosure
13 request form to us.
14      Q   All right. That would happen after you
15 received the form filled out by the consumer.
16          Correct?
17      A   That is correct.
18      Q   Now, before -- let me ask you this; how was
19 that form made available to consumers to fill out in
20 the first place?
21          MR. RAETHER: Objection to form.
22 BY MR. FRANCIS:
23      Q   You can answer.
24      A   The form was available to consumers either
25 to download from our website in a PDF form, to call and

Page 31

1  leave a message on our automated systems with their
2  name and mailing address information and where we would
3  send them a form.
4           Some of our properties keep the form on
5  hand and routinely hand it out to a consumer when they
6  receive an adverse action notice.
7       Q   Were there any other methods by which the
8  company would provide that form or any other
9  circumstances in which the company would provide the
10 form to the consumer to be filled out?
11          MR. RAETHER: Objection to form.
12      A   Aside from the ones I have already
13 outlined, if a consumer called and stated that they
14 needed a form, that would also be -- if they spoke with
15 a live person, they would also be sent the form.
16 BY MR. FRANCIS:
17      Q   What if a consumer sent a mailed request
18 for a copy of their file disclosure?
19          Would the form be sent to them?
20      A   If the consumer sent a mailed request, a
21 written request that would be treated as a disclosure
22 request and would be fulfilled based upon the
23 information contained in their written document or
24 written correspondence to us.
25      Q   All right. If the consumer simply asked

Page 32

1  for a copy of their file, for example, provided their
2  name and their social security and their date of birth,
3  nothing more, would the form be sent to them?
4       A   If the consumer provided us with a name, a
5  social security number and a date of birth and there
6  was an address, either on the return envelope or within
7  the correspondence, the consumer would be provided with
8  any historical report that we could match that
9  identifying information to as well as a newly generated
10 report using the name, social security number, date of
11 birth and address in the correspondence to us.
12      Q   All right. Were there ever times in
13 response to a written file request that the company
14 would send the consumer the form, the CRD001 form?
15      A   Yes.
16      Q   What were the circumstances in which the
17 consumer would get the form sent to them?
18      A   If the consumer provided such limited
19 information in their written correspondence that we
20 could not either ascertain their identity or any
21 matching criteria in our system, they might be sent a
22 disclosure request based on what they provided in their
23 written correspondence as well as the form for a
24 potentially more complete disclosure file request or if
25 we were not able to ascertain any identity or enough

Page 33

1  information to run a report, we would send them the
2  form.
3      Q   All right. What was the minimal amount of
4  information that the consumer would need to provide in
5  writing in order to get a disclosure versus getting
6  that form sent to them?
7      A   A name and address.
8      Q   So, if a consumer made a request for a copy
9  of his or her consumer file disclosure as long as they
10 provided his or her name and address, that would prompt
11 them getting a copy of their file disclosure.
12         Is that correct?
13     A   Based on that information, yes.
14     Q   All right. Now, in connection with a
15 written consumer file disclosure request, are you
16 saying that simply sending the letter requesting a copy
17 of the file along with the consumer's name and address
18 would be sufficient to obtain a consumer file
19 disclosure request?
20     A   It would be sufficient to obtain a file
21 disclosure request, yes.
22     Q   All right. The consumer would not need to
23 supply any type of documentation?
24     A   As long as we could identify matching
25 criteria in our system to ascertain that the consumer

Page 34

1  was who they said they were, if we saw no match on an
2  address or a name, we might ask for documentation or if
3  we believed there was some reason to suspect fraud.
4      Q   But, if you had a match based upon the name
5  and address alone, that would be sufficient in terms of
6  the company sending the consumer his or her file
7  disclosure?
8          MR. RAETHER: Objection; asked and
9  answered.
10 BY MR. FRANCIS:
11     Q   You can answer.
12     A   The consumer would get a file disclosure
13 based on what they provided to us. So they would
14 receive a file disclosure then based on name and
15 address.
16         Without a social security number or a date
17 of birth, that would be limited information that we
18 would run -- we would run a file disclosure based on
19 name and address but that is the file disclosure they
20 would get as opposed to one that might have more
21 comprehensive information.
22     Q   All right. I understand.
23         My question was, at the point of
24 determining whether or not you need -- that the
25 consumer needs to send in additional documentation, as

Page 35

1  long as there was a name and address match in the
2  system, that would be fine.
3          You would not need additional documentation
4  from the consumer.
5          Correct?
6          MR. RAETHER: Objection to form.
7      A   If the name and address of the consumer
8  supplied matched information in our database, they
9  would not need to send additional documentation.
10 BY MR. FRANCIS:
11     Q   I see. All right. You were mentioning
12 other circumstances that would prompt the sending by
13 the company of the CRD001 form to a consumer, and one
14 of the circumstances you mentioned was a telephone call
15 to the company's number.
16         Correct?
17     A   That is correct.
18     Q   I think you mentioned there was a voicemail
19 set up?
20     A   That is correct.
21     Q   All right. Can you tell me about the
22 process that would -- what would happen if a consumer
23 called the company's number, got the voicemail, how
24 would that lead to the sending of the CRD001 form?
25     A   If the company called our voicemail, it was

Page 36

1  essentially a phone tree. They selected the option for
2  file disclosure, they are asked to leave their name and
3  mailing information.
4          That information was then downloaded
5  initially once a day, later three times a day to be
6  able to send the form out faster the same day.
7          The automated message also advised the
8  consumer that there was a website; if they wished to go
9  to the website and download it immediately, they could
10 do that, as well.
11     Q   If they went to the website looking to make
12 a file disclosure request, would they be directed to
13 the form?
14     A   I'm sorry. Can you repeat the question?
15     Q   Sure. If they went to the website with the
16 intent of doing whatever they needed to do to get a
17 copy of their file disclosure request, would they be
18 presented with the form or how would the form end up
19 being sent to them in that instance?
20     A   If they went to the website, they could
21 click on the PDF link to physically call up and
22 download the form themselves from their computer.
23     Q   Are you saying that the website had
24 instructions on it which informed the consumer that if
25 they wanted to make a file disclosure request that they

Exhibit 2 Page 29

**Moreland v. Corelogic Saferent, LLC**  ROBYN SMALL-CONFIDENTIAL, 2/5/14

Page 37

1   could do so by downloading the form?
2   A    That is correct.
3   Q    In that download of the CRD001 form, did it
4   include the instructions?
5   A    It did.
6   Q    Was there a voicemail that was specifically
7   dedicated to handling consumer file disclosure
8   requests?
9   A    It was a phone tree with a dedicated
10  voicemail box for disclosure file requests.
11  Q    All right.  So, if somebody called up any
12  time of the day and they were looking for a consumer
13  file disclosure request, would they be directed to that
14  voicemail?
15  A    That is correct.
16  Q    All right.  There wouldn't be a live person
17  that they would get?
18  A    On the voicemail phone line, there would
19  not be a live person.  There was an option on the phone
20  tree to be connected to a live person during regular
21  business hours, Monday through Friday, 9:00 to 5:00
22  East Coast time.
23  Q    I see.  So, correct me if I'm wrong, I
24  think what you are saying is that when they call the
25  number they would get a phone tree of some sort.

Page 38

1   Correct?
2   A    Yes.
3   Q    It says, press one for this; press two for
4   this; press three for that.
5   Correct?
6   A    Correct.
7   Q    One of those press this, was a press this
8   for if you want your file disclosure request.
9   Correct?
10  A    That is correct.
11  Q    If they pressed that number, they would go
12  into the voicemail that would inform them where they
13  could leave their identifying information?
14  A    That is correct.
15  Q    Correct?
16  Then based upon that identifying
17  information, the company would then send them the
18  CRD001 form.
19  Correct?
20  A    That is correct.
21  Q    I got it.  All right.
22  Was there a method by which they could do
23  the same thing with the website or did they have to
24  download the form themselves?
25  In other words, would they leave a message

Page 39

1   on the website, and then somehow they would be sent the
2   form or was the only way to get the form in connection
3   with a website request through a download?
4   A    The form was only available through
5   download on the website.
6   Q    All right.  Like with the phone tree
7   process that I went through, would I be correct in
8   understanding that if the consumer went to the
9   company's website to look for how to get a copy of
10  their consumer file disclosure request they would be
11  directed to a page of the company's website that
12  included the download for that form?
13  A    That is correct.
14  Q    I understand.  Do you know the URL of the
15  website that contains that page?
16  Do you know the URL for that page?
17  A    I don't know what it is today.  I don't
18  recall what it was a year and a half ago.
19  Q    All right.  Do you know if the company --
20  it was on the company's main website?
21  A    Yes.
22  Q    All right.  Did the company use any other
23  web pages to fulfill consumer file disclosure requests
24  other than the page on the main website?
25  MR. RAETHER:  Objection to form.

Page 40

1   BY MR. FRANCIS:
2   Q    You can answer.
3   A    Not that I am aware of.
4   Q    All right.  I believe you mentioned that
5   one of the changes that had occurred over your tenure
6   at the company was the availability to make a request
7   for a file disclosure via fax.
8   Is that correct?
9   A    That's correct.
10  Q    If the company received a file disclosure
11  request through a fax, what would happen then?
12  How would that work?
13  A    The fax was checked hourly.  It's in a
14  secured room.  If it's retrieved off the fax, it was
15  date stamped as having been received.
16  It was put in a queue along with any that
17  were received by mail and processed in the order that
18  they are received.
19  Q    All right.  Were there times in which a
20  faxed consumer file disclosure request would be
21  responded to by a sending of the CRD001 form?
22  A    Yes.
23  Q    What are those occasions?
24  A    If there were not enough identifying
25  information on the faxed request or any matching

Page 85

1 dispute.
2 Q All right. Now, do you remember when I was
3 asking you questions a little while ago about what the
4 company's processes were for responding to consumer
5 file disclosure requests coming from different sources?
6    Do you remember when we were going over
7 that?
8 A Yes.
9 Q And I asked you what if somebody did this,
10 what would happen? Would you send them a letter or
11 would you send them a file disclosure?
12    Do you remember those questions?
13 A I do.
14 Q Back in October of 2012, what was the
15 procedure for handling a letter like SR7?
16 A Through my department, if this had been
17 received in October of 2012, we would have searched our
18 database for a match, matching criteria, matching on a
19 name, a social security number that was provided here,
20 date of birth, and/or address and pulled the historical
21 report if one existed; and then we would have run a
22 file disclosure, based on the name Susan Moreland and
23 on the name Susan Burbano with the address of 808 Loma
24 Alta Terrace, Vista, California using the social
25 security number that she has provided here as well as

Page 86

1 the date of birth.
2 Q Would the company send a -- what is it --
3 CRD001 form in connection with a request like this?
4 A Probably not.
5 Q All right. Are there instances in which it
6 would and instances in which it would not?
7 A They are unique but if we had found no
8 matching criteria in Ms. Moreland's letter and what was
9 in our database, we might send a form if she had
10 implied she had applied at a property. This particular
11 letter does not indicate that she has applied
12 somewhere.
13    So she probably would not have been sent a
14 form. If she had made a statement in her letter that
15 said I applied at property X, Y, Z but we could not
16 find that based on the information that was here, we
17 might have sent her a form for additional information,
18 which would give us prior addresses and things that
19 might help us find a report.
20    If the social security number didn't match
21 what was in our database, we might have sent her a
22 form, in order to ascertain whether she maybe mistyped
23 her own social here or whether the property misinput
24 (sic) her information; but based on this letter, I
25 don't believe she would have been sent a form.

Page 87

1    She would have simply been sent disclosure
2 based on information that was provided.
3 Q Now, do you know what the company did in
4 response to this letter, what your department did?
5 A I do.
6 Q What happened?
7 A Because her file -- her request was bundled
8 as an inquiry dispute, she did receive a form for
9 reinvestigation, a dispute form along with a statement
10 that insufficient information had been received and
11 asking her to please complete the form and specify an
12 inquiry date that she was disputing.
13 Q Was that response compliant with the
14 company's procedures?
15 A It was not.
16 Q It was not why?
17 A It was not compliant with the company's
18 procedures for a file disclosure.
19    It would have been compliant for a response
20 with an inquiry dispute.
21 Q All right. It was not compliant with
22 company procedures for the request that she made
23 because why?
24 A Because she is asking for everything in her
25 file which sounds like a file disclosure request.

Page 88

1 Q Is it your testimony that had she actually
2 been making a dispute that the response that the
3 company had was compliant with its current procedures?
4 A Had she been disputing an inquiry, the
5 response she received would have been compliant with
6 our process.
7 Q And that response being among other things
8 a request for additional information.
9    Correct?
10 A That's correct.
11 Q Would that be compliant with any dispute or
12 just inquiry disputes?
13 A That is compliant with inquiry disputes and
14 particularly to the information that was contained in
15 this letter, because there is no specification of what
16 inquiry date was being disputed, so among the
17 additional information and as stated on the response
18 packet, they would ask her for the date that she is
19 disputing; because sometimes our consumers have been
20 run by multiple properties and they are not disputing
21 all of them, only one particular inquiry.
22    We would need additional information
23 because we would try to obtain the actual lease
24 application, which means we would want something to
25 compare it to.

Page 89

1  Q  All right. Along with that would the
2  CRD001 letter or form be sent?
3  A  The request for disclosure would not have
4  been sent as part of an inquiry dispute.
5  Q  All right. Do you know whether she was
6  sent that form in this case?
7  A  I know that she was not sent the disclosure
8  request form by my department.
9  Q  All right. But she was sent a different
10 type of form.
11    Correct?
12 A  She was sent a dispute form.
13 Q  Dispute form. All right.
14    Do you know why her file disclosure request
15 from October of 2012 was not handled in a compliant
16 way?
17 A  Can you be more --
18 Q  Sure. Do you know why it was treated as an
19 inquiry dispute as opposed to responding and giving her
20 everything in her file?
21 A  She was treated as an inquiry dispute by my
22 department because of the way in which I believe it
23 came to us.
24    I can't attest to why it was put into an
25 inquiry bundle in Poway and not treated as a disclosure

Page 90

1  there.
2  Q  When you would receive bundles of inquiry
3  disputes, would your department review the actual
4  documentation from the consumers?
5  A  They would review the documentation from
6  the consumers as it related to an inquiry dispute.
7  Q  So, even if they get a letter that says,
8  like this one, "Please give me everything in my file,
9  in my consumer file," they still would not respond to
10 it as a consumer file request?
11    Is that what you are saying?
12    MR. RAETHER: Objection to form.
13 BY MR. FRANCIS:
14 Q  You can answer.
15 A  I'm saying this was not responded to as a
16 file disclosure but it was responded to as an inquiry
17 dispute.
18    Should someone have red flagged it and said
19 "This sound strange," I don't know. I know that it was
20 sent to us as an inquiry and treated as an inquiry
21 dispute.
22 Q  I understand that but my question was
23 slightly different. That was, generally back then, in
24 connection with a bundle of inquiry disputes, was your
25 staff instructed to read those, the contents of those

Page 91

1  disputes?
2  A  They were not.
3  Q  They were not. All right.
4     How would they be able to respond to a
5  dispute if they did not read what the consumer said?
6  A  They would read what the consumer submitted
7  in response to researching an inquiry dispute, so they
8  are looking for specific information such as an inquiry
9  date, a matching social security number or a different
10 social security number as the case might be and pulling
11 documents as to who inquired on the person, what client
12 so that we could request additional information from
13 the client if we received identifying information from
14 the consumer.
15 Q  All right. But they were not instructed to
16 read what the consumer said.
17    Correct?
18    MR. RAETHER: Objection to form.
19 A  My team that was processing inquiry
20 disputes were operating under the premise that it had
21 already been filtered out and determined to be an
22 inquiry dispute by the Poway office.
23    We were not using the Poway address in any
24 form at that time. It was probably not on anyone's
25 radar screen to have received a disclosure request

Page 92

1  coming to us from Poway.
2  BY MR. FRANCIS:
3  Q  All right. So they were looking at it
4  exclusively as an inquiry dispute regardless of what
5  the consumer said.
6     Correct?
7     MR. RAETHER: Objection to form.
8  A  In the packet that came to us as an inquiry
9  dispute, which is what I believe this document was sent
10 to us as, they were looking for specific criteria as it
11 related to inquiry disputes and not to whatever else
12 was contained in the letter.
13 BY MR. FRANCIS:
14 Q  So, if the consumer happened to along with
15 an inquiry dispute ask for a file request that would
16 not be processed.
17    Correct?
18    MR. RAETHER: Objection to form.
19 A  Had it come to us in the bundle for
20 inquiries from Poway, it would have been treated solely
21 as an inquiry dispute.
22 BY MR. FRANCIS:
23 Q  All right. As this one was. Correct?
24 A  As this one was.
25 Q  All right.

CERTIFICATE OF NOTARY

I, JANICE JONES, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties thereto, nor financially or otherwise interested in the outcome of this action.

*Janice Jones*

JANICE JONES
Notary Public in and for the
Commonwealth of Virginia
Registration No. 7566898

My Commission Expires:
March 31, 2017

Exhibit 2 Page 33

ROBYN SMALL-CONFIDENTIAL

SIGNATURE PAGE

- - -

I hereby acknowledge that I have read the aforegoing transcript, dated February 5, 2014, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the errata sheet.

- - -

SIGNATURE: _____
Robyn Small

DATE: 3/6/14

WITNESSED BY: _____

Exhibit 2 Page 34